IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE ACIS CAPITAL MANAGEMENT, L.P., et al., | § § § | |
| Debtors. | § § | |
| NEUTRA, LTD., et al., | § § § | Civil Action No. 3:18-CV-1056-D (Consolidated with Civil Action Nos. 3:18-CV-1057-D, 3:18-CV-1073-D, and 3:18-CV-1084-D) |
| Appellants, | § § | |
| VS. | § § | (Bank. Ct. Nos. 18-30264-SGJ-7; 18-30265-SGJ-7) |
| JOSHUA N. TERRY, et al., | § § | |
| Appellees. | § | |
| IN RE ACIS CAPITAL MANAGEMENT, L.P., et al., | § § § | |
| Debtors. | § § | |
| HIGHLAND CLO FUNDING, LTD., et al., | § § § | Civil Action No. 3:18-CV-1822-D (Bank. Ct. Nos. 18-30264-SGJ-11 and 18-30265-SGJ-11) |
| Appellants, | § § | |
| VS. | § § | |
| ROBIN PHELAN, CHAPTER 11 TRUSTEE, et al., | § § § | |
| Appellees. | § | |

| | |
|---|---|
| IN RE ACIS CAPITAL MANAGEMENT, L.P., et al., | § § § |
| Debtors. | § § |
| | § Civil Action No. 3:19-CV-0291-D |
| HIGHLAND CAPITAL MANAGEMENT, L.P., et al., | § (Bank. Ct. Nos. 18-30264-SGJ-11 and § 18-30265-SGJ-11) § |
| Appellants, | § § |
| VS. | § § |
| ROBIN PHELAN, CHAPTER 11 TRUSTEE, et al., | § § § |
| Appellees. | § § |

_____

APPEALS FROM THE
UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS

FITZWATER, Senior Judge:

In multiple appeals taken from two involuntary bankruptcy cases, the principal questions presented are whether the bankruptcy court erred by issuing orders for relief and denying the debtors' motion to dismiss or compel arbitration; whether the bankruptcy court erred by approving a seven-figure break-up fee in favor of a potential transaction partner; and whether the bankruptcy court erred by confirming a reorganization plan ("the Plan") that enjoins a non-debtor, non-creditor entity from exercising certain contractual rights. The court must also decide questions of the bankruptcy court's subject matter jurisdiction and of one appellant's standing to appeal. For the reasons that follow, the court DISMISSES the appeal from the orders for relief, AFFIRMS the break-up fee order, and AFFIRMS the order

approving the Plan.  The court need not address the bankruptcy court's denial of the motion to dismiss.

## I

The following factual summary is based on the bankruptcy court's findings of fact in support of the orders for relief and the Plan confirmation order.  *See In re Acis Capital Mgmt., L.P.* (*Acis II*), 2019 WL 417149, at *2-7 (Bankr. N.D. Tex. Jan. 31, 2019) (Jernigan, J.) (confirmation order); *In re Acis Capital Mgmt., L.P.* (*Acis I*), 584 B.R. 115, 119-42 (Bankr. N.D. Tex. 2018) (Jernigan, J.) (orders for relief).[1]

## A

Appellant Highland Capital Management, L.P. ("Highland") is a Dallas-based registered investment advisor that manages nearly $15 billion of assets through an organizational structure comprised of roughly 2,000 different entities.  Its investment vehicles include mutual funds, private equity funds, and (relevant here) collateralized loan obligation funds ("CLOs").  Highland conducted its CLO business through an entity called Acis Capital Management, L.P. ("Acis LP") and Acis LP's general partner, Acis Capital Management GP, L.L.C. ("Acis GP") (collectively, "Acis," unless otherwise indicated), both debtors in these appeals.

In 2005 Highland hired appellee Joshua Terry ("Terry") as a portfolio analyst.  Terry

---

[1]"The court reviews the bankruptcy court's . . . fact findings only for clear error."  *In re Nary*, 253 B.R. 752, 756 (N.D. Tex. 2000) (Fitzwater, J.) (quoting *In re ICH Corp.*, 230 B.R. 88, 91 n.10 (N.D. Tex. 1999) (Fitzwater, J.)).

rose through the ranks at Highland until he became the portfolio manager for Highland's CLO business, and, in turn, received a 25% limited partnership interest in Acis LP. Terry successfully managed billions of dollars of assets on Highland's behalf until June 2016, when Highland terminated him. The reason for Terry's termination is disputed.[2] As a result of the termination, Terry's partnership interest in Acis LP was deemed forfeited without compensation.

In September 2016 Highland sued Terry in the 162nd Judicial District Court of Dallas County, seeking to recover, *inter alia*, on theories of breach of fiduciary duty, disparagement, and breach of contract. Terry asserted counterclaims against Highland, Acis, and others, and demanded arbitration. The state court stayed the proceeding and ordered arbitration, and in October 2017 the arbitration panel rendered an award in Terry's favor for $7,949,749.15, plus post-judgment interest, against Acis ("the Award"). Terry sought and obtained confirmation of the Award in the 44th Judicial District Court of Dallas County.

After the Award was confirmed, Terry began conducting post-judgment discovery, which revealed some transactions that appeared suspicious to Terry. Terry thought that Highland was denuding Acis of assets in an effort to make Acis judgment-proof. At a January 24, 2018 hearing, Terry requested a temporary restraining order ("TRO") to restrain

---

[2]According to the bankruptcy court, "[t]he arbitration panel that issued the Arbitration Award found that Mr. Terry was terminated for essentially doing the right thing for investors." *Acis II*, 2019 WL 417149, at *14; *see also* P. 1st Supp. to Pet. to Confirm Arbitration Award Exh. 1, No. DC-17-15244 (44th Dist. Ct., Dall. Cty., Tex. filed Nov. 13, 2017).

Acis LP from transferring any more assets pending a January 31 temporary injunction hearing. Acis LP agreed to the request, and the court issued a TRO. Five days later, Terry filed supplemental pleadings alleging that Acis LP was engaging in more wrongdoing, and requested appointment of a receiver. Instead of proceeding with the January 31 state-court hearing, however, Terry took a different tack. At 11:57 p.m. the night before the hearing, Terry filed involuntary bankruptcy petitions against both Acis LP and Acis GP.[3]

B

To comprehend some of the key issues in these appeals, it is helpful to recount some of the fundamentals of CLOs and how Highland structured its CLO business.

At the most basic level, a CLO is a "basket of loans." *Acis I*, 584 B.R. at 123. A special-purpose CLO entity ("CLO-SPE") purchases variable-rate commercial loans at the direction of the CLO manager, and collects them into a pool of loans. The obligors of the loans are usually large, well-known companies. Investors, such as pension funds, life insurance companies, and others, buy into the CLO by purchasing fixed-rate, secured notes on which the CLO-SPE itself is the obligor. These notes are typically sold in tranches representing different levels of risk. The CLO-SPE pays its obligations on the secured notes using the income it receives from its pool of loans, starting with the top tranche of notes and then proceeding through the lower tranches. These payments are made according to the terms of certain indenture agreements between the CLO-SPE and the indenture trustee (here,

---

[3]The bankruptcy court administratively consolidated the two cases, appointed a single trustee, and ultimately confirmed one Plan applicable to both alleged debtors.

- 5 -

U.S. Bank, N.A.) to whom the CLO-SPE pledges collateral to secure the notes.

The last investor to be paid is the "equity" holder, who does not own actual equity but instead holds a subordinated, unsecured note. The equity investor earns money when the variable interest rates paid to the CLO-SPE on the commercial loans exceed the fixed interest rates that the CLO-SPE must pay to the secured note holders. Although the equity investor assumes the most risk, it also possesses certain rights that allow it to control the CLO—most significantly, the right to call for an optional redemption of the CLO.[4] When an optional redemption is effected, the CLO's pool of loans is liquidated and the resulting cash is used to pay back the outstanding secured notes, beginning with the top tranche and proceeding downward.[5]

In the present cases, Acis LP acts as the portfolio manager—*not* as the equity holder—of four CLO-SPEs, and is contractually entitled to receive portfolio management fees from them. Appellant Highland CLO Funding, Ltd. ("HCLOF"), a Guernsey[6] entity formerly known as Acis Loan Funding, Ltd.,[7] is the primary equity investor in the CLOs.

_____

[4]It is disputed whether the equity holder in this case had the right to compel Acis LP to effect an optional redemption of the relevant CLOs against Acis LP's will. The court need not resolve this dispute and therefore suggests no view on this question.

[5]The holders of the top tranche of secured notes also have special rights—namely, the right to terminate the CLO manager for cause on 45 days' notice. The note holders in these cases have so far not exercised that right.

[6]Guernsey is a small island nation located in the English Channel.

[7]For clarity, the court will refer to this entity as HCLOF, even when describing events that occurred before the entity changed its name.

HCLOF does not own Acis; to the contrary, Acis LP once owned an indirect 15% stake in HCLOF for regulatory compliance reasons. Acis itself has never had any employees. Instead, it subcontracts all front office advising and back office support services to another entity. Highland was originally Acis LP's subcontractor, but, under the Plan, an entity called Brigade Capital Management, L.P. ("Brigade") fills that role (for a much lower cost).

Historically, all of these entities—Acis LP, Highland, HCLOF, and the CLO-SPEs—operated within an ecosystem of contracts that allowed Acis to manage the CLOs effectively. First, Acis LP had various fee-generating portfolio management agreements ("PMAs") with the CLO-SPEs . These contracts remain in place under the Plan. Second, Acis LP and Highland had a sub-advisory agreement, which obligated Highland to provide advisory and management services in exchange for substantial fees. Third, Acis LP and Highland had a shared services agreement, through which Highland provided back office services to Acis for a significant fee. And, fourth, Acis LP had a separate PMA with HCLOF ("the Equity PMA"). While the parties dispute the exact effect of the Equity PMA—i.e., to whom it gave power over whom—it is undisputed that Acis LP earned no fees from this contract.

## C

Circumstances changed after the state-court litigation between Highland and Terry began. As noted above, Highland and Acis LP engaged in numerous transactions that caused Terry to believe "that Highland was dismantling and denuding Acis LP of all of its assets and value." *Acis I*, 584 B.R. at 144. In October 2017, four days after Terry obtained the Award,

Acis LP sold its stake in HCLOF back to HCLOF in exchange for about $990,000 in cash. As a result, Acis LP could no longer lawfully manage any new CLOs under the applicable regulatory scheme. Three days later, HCLOF entered into a new PMA—a replacement for the Equity PMA—with a recently-formed Cayman Islands entity called Highland HCF Advisor, Ltd. At around the same time, Acis LP terminated the original Equity PMA. In early November 2017, Acis LP transferred one of its most significant assets—a $9.5 million note receivable that Highland owed to it—to another Cayman Islands entity, Highland CLO Management, Ltd. ("Highland Management"). Acis LP transferred the note pursuant to a contract that provided that Highland Management would step into Acis LP's shoes as the portfolio manager for the CLOs. Highland Management also promised to reimburse Acis LP for up to $2 million of future legal fees and up to $1 million of future administrative expenses. One day after the Award was confirmed, Acis LP transferred away "the vehicle that can most easily be described as the Acis LP 'risk retention structure' (necessitated by [the] federal Dodd Frank law)" to Highland CLO Holdings Ltd., yet another Cayman Islands entity. *Acis I*, 584 B.R. at 129. That same day, Acis LP conveyed to the same Cayman Islands entity its contractual right to receive management fees from a particular CLO-SPE. This contractual right was worth $5 million, but all Acis LP received in return was forgiveness of a $2.8 million receivable that it owed to Highland.

On the day after Terry obtained his final judgment in the 44th Judicial District Court of Dallas County, Acis LP underwent a sudden change in ownership. Previously, Acis LP's limited partners were Mark Okada ("Okada"), Highland's chief investment officer, and the

Dugaboy Investment Trust, a family trust of Highland's CEO, James Dondero. But on December 18, 2017 Okada and the Dugaboy Investment Trust both conveyed their interests in Acis LP to appellant Neutra, Ltd. ("Neutra"), a Cayman Islands exempted company. The Dugaboy Investment Trust also conveyed its 100% ownership interest in Acis GP to Neutra. Thus Neutra became Acis' sole equity owner.

Highland asserts that these transactions were part of a market-driven restructuring, or "reset," of Highland's CLOs. According to Highland's witnesses, Acis LP had become "'toxic' in the market place" due to the litigation with Terry, and had to be excised from Highland's CLO business. *Acis I*, 584 B.R. at 128; *accord Acis II*, 2019 WL 417149, at *11. HCLOF also has an anonymous, third-party institutional investor ("the Passive Investor") who purportedly demanded that Acis LP be removed as Highland's CLO manager. But the Passive Investor's representative testified at a hearing that the Passive Investor had made no such demand, and the bankruptcy court found that Highland's testimony about Acis' supposed toxicity was not credible. According to the bankruptcy court, Highland's explanations for the transfers described above were "a seemingly manufactured narrative to justify prior actions." *Acis II*, 2019 WL 417149, at *16 (capitalization omitted). The bankruptcy court rejected this narrative, finding that "[t]he evidence established overwhelmingly that there is a substantial likelihood that the transfers were part of an intentional scheme to keep assets away from Mr. Terry as a creditor." *Id.* at *12.

D

Terry filed the involuntary petitions against Acis LP and Acis GP in order to stop the apparent transfer of assets away from Acis LP. *See Acis I*, 584 B.R. at 144. Fast-paced litigation followed.

On March 19, 2018—two days before the scheduled trial on the involuntary petitions—Acis filed a motion to dismiss for lack of subject matter jurisdiction, or, in the alternative, to compel arbitration ("the Arbitration Motion"). The bankruptcy court's decision to deny this motion is at issue in all three of the instant appeals. The Arbitration Motion was based on the Acis LP limited partnership agreement ("the Acis LPA"), which governed the relationship between Terry and Acis. The Acis LPA provides a dispute resolution procedure for "any controversy or claim . . . arising out of, relating to or in connection with the [Acis LPA] or otherwise involving the Partnership, its Partners and/or any GP Party." Third Appeal R. 4504 (brackets in original). Under this dispute resolution procedure, the parties must first attempt to mediate any dispute; only after mediating may they resort to binding arbitration. Any party who fails to mediate a claim, or who files a judicial lawsuit, ostensibly waives that claim. Acis argued in the Arbitration Motion that the Acis LPA's dispute resolution provisions applied to the involuntary petitions, and that because Terry failed to comply with those provisions, the bankruptcy court lacked subject matter jurisdiction over the controversy. The bankruptcy court denied the Arbitration Motion on the eve of trial.

In the early morning hours of the day the trial was scheduled to begin (at 2:33 a.m.),

several Highland-related entities—including Neutra and HCLOF—filed a motion to intervene. They sought intervention as of right under Fed. R. Bankr. P. 7024, or, alternatively, permissive intervention under Rule 2018.[8] The putative intervenors did not, however, intend to participate in the trial; they sought only to preserve their right to appeal any adverse ruling. The bankruptcy court denied the motion.

The trial of the involuntary petitions began as scheduled on March 21, 2018, and spanned five days. On the first day of trial, the putative intervenors informed the bankruptcy court of their objection to the involuntary petitions, and they appeared via counsel during each day of the trial. Following the trial, the bankruptcy court ruled in favor of Terry as the petitioning creditor, concluding that Acis had fewer than 12 eligible creditors; Acis was not generally paying its debts as they came due; Terry filed the involuntary petitions in good faith; and abstention under 11 U.S.C. § 305 was not warranted. The bankruptcy court issued orders for relief on April 13, 2018.

E

Highland and its related entities continued to participate in the bankruptcy court proceedings after the orders for relief were issued. The bankruptcy court, after finding that a "trustee appears necessary to halt the post-Arbitration Award transactions and transfers of value out of Acis LP . . . [and] to resolve the inherent conflicts of interest between [Acis] and Highland," appointed Robin Phelan ("the Trustee") as trustee. *See Acis I*, 584 B.R. at 149-

---

[8]Unless otherwise indicated, all citations in this opinion to a "Rule" are to the Federal Rules of Bankruptcy Procedure.

50.  On April 30, 2018 HCLOF—acting in its capacity as the equity note holder—sent five notices to Acis LP directing it to effect an optional redemption of the Acis CLOs on June 14, 2018.  The Trustee analyzed the notices and concluded that they were defective.

Highland and HCLOF responded by filing an adversary proceeding against the Trustee, seeking to compel the Trustee to effect a redemption.[9]  The bankruptcy court *sua sponte* issued a TRO forbidding all relevant parties (including HCLOF) from taking any action in furtherance of an optional redemption of the CLOs.  HCLOF then informed the bankruptcy court at a June 14, 2018 hearing that it had withdrawn the optional redemption notices.  Because of HCLOF's representation, the Trustee did not seek to extend the TRO. The next day, HCLOF sent a *second* set of notices to Acis LP, again demanding that Acis LP effect an optional redemption of the CLOs.  The Trustee then filed his own adversary proceeding ("the Trustee Adversary") against Highland, HCLOF, and others, seeking a *second* TRO.[10]  The bankruptcy court granted the TRO, and, after an evidentiary hearing, converted the TRO into a preliminary injunction.

While these adversary proceedings were taking place, the Trustee was preparing a chapter 11 reorganization plan for Acis.[11]  The Trustee initially proposed three plans: Plan A, Plan B, and Plan C.  Under Plan A, the Trustee—using the doctrine of equitable

[9]Adversary Proceeding No. 18-03078-SGJ.

[10]Adversary Proceeding No. 18-03212-SGJ.

[11]When the bankruptcy court issued the orders for relief, the cases were under chapter 7 of the Bankruptcy Code.  The bankruptcy court later converted the cases to chapter 11 cases.

subrogation—would have transferred HCLOF's subordinated equity notes to a third party—Oaktree Capital Management LP ("Oaktree")—in exchange for a $100 million payment to HCLOF, and would have paid off Acis' other creditors with additional funds provided by Oaktree. Plans B and C would have amended the indenture agreements to prohibit any redemption right from being exercised until all allowed claims were paid in full. The purpose of Plans B and C was to prevent HCLOF from calling for an optional redemption of the CLOs, which would have rendered Acis LP's fee-paying PMAs worthless. The bankruptcy court ultimately held that all three of these proposed plans were unconfirmable.

Before proposing Plans A, B, and C, the Trustee asked the bankruptcy court to approve the payment of a $2.5 million break-up fee ("the Break-Up Fee") to Oaktree if Plan A was not confirmed within a certain time period. This Break-Up Fee was a small percentage of the total value of the Plan A transaction—which was roughly $108 million—but represented a large percentage of the $8.6 million that Acis LP would retain after HCLOF was compensated for its subordinated notes. The Trustee's motion also sought to substitute Oaktree for Highland as Acis LP's investment advisor and service provider. The Trustee also requested that Oaktree be reimbursed for any reasonable expenses it might incur in connection with the proposed transaction ("the Expense Reimbursement"). The bankruptcy court granted the motion with minor modifications.[12]

---

[12]Brigade—not Oaktree—now provides advisory and back office services to Acis.

After the bankruptcy court rejected Plans A, B, and C, the Trustee proposed—and the bankruptcy court confirmed—Plan D. Under the confirmed Plan, Terry received full equity ownership of Acis in exchange for a $1 million reduction in the value of his claim. Acis LP continues to serve as the portfolio manager for the Acis CLOs and continues to earn management fees. The cash flow resulting from Terry's operation of Acis will be used to pay the claims of Acis' creditors, including Terry. To prevent Highland and HCLOF from disrupting this cash flow, the bankruptcy court entered an injunction ("the Temporary Injunction")[13] prohibiting various parties and non-parties—including HCLOF—from taking any steps to effect an optional redemption or liquidation of the Acis CLOs. The Temporary Injunction is actually an extension of the preliminary injunction that the bankruptcy court issued in the Trustee Adversary. It is set to expire upon the earlier of the following: (1) the entry of a final order in the Trustee Adversary; (2) the satisfaction of all allowed claims against Acis; (3) the bankruptcy court's entry of an order finding that a material default has occurred under the Plan; or (4) any subsequent order of the bankruptcy court providing otherwise as to one or more of the CLOs.

F

Three appeals (the first consisting of four consolidated appeals)[14] taken from the

---

[13]Because the briefing refers to the plan injunction as a "temporary" injunction rather than a "preliminary" injunction, which is the federal nomenclature, the court will do so as well.

[14]The First Appeal consists of four consolidated appeals. No. 3:18-CV-1056-D is an appeal of the order denying Neutra the right to intervene in the involuntary proceeding

bankruptcy court's rulings are now before this court. For clarity, the court will refer to the appeals as the First, Second, and Third Appeals.

In the First Appeal (No. 3:18-CV-1056-D), appellant Neutra[15] contends that the bankruptcy court erred by denying the Arbitration Motion,[16] failing to dismiss the involuntary petitions on the ground that they were filed in bad faith, and declining to abstain under 11 U.S.C. § 305.

---

against Acis GP. No. 3:18-CV-1073-D is an appeal of the order for relief as to Acis LP. No. 3:18-CV-1084-D is an appeal of the order denying Neutra the right to intervene in the involuntary proceeding against Acis LP.

No. 3:18-CV-1057-D is *supposed* to be an appeal of the order for relief as to Acis GP, but, due to a filing error, the notice of appeal actually challenges the order denying intervention as to Acis GP—the same order at issue in 3:18-CV-1056-D. Neutra attempted to remedy this mistake by filing a second amended notice of appeal in the bankruptcy court, but that notice was erroneously transmitted to the docket of 3:18-CV-1084-D instead of 3:18-CV-1057-D. Because these are ministerial errors that do not affect the court's jurisdiction, the court will correct them at the conclusion of this opinion. *See, e.g., In re Smith*, 133 B.R. 800, 804 (N.D. Tex. 1991) (Fitzwater, J.) ("In contrast to the failure properly to designate an appellant, which is a jurisdictional defect, the failure to specify the correct judgment is irrelevant where it is clear which judgment the appellant is appealing." (citations omitted)).

[15]HCLOF and an entity called CLO Holdco Ltd. are also named as appellants in the First Appeal. Neutra is the only appellant, however, who has submitted briefing.

[16]Neutra did not file a separate notice of appeal with respect to the order denying the Arbitration Motion. Instead, it contends that this order is an interlocutory order that merged into the orders for relief, which are final orders for the purposes of 28 U.S.C. § 158(a)(1). *See In re Manuel Mediavilla, Inc.*, 568 B.R. 551, 566 (B.A.P. 1st Cir. 2017); *In re Marciano*, 459 B.R. 27, 36 (B.A.P. 9th Cir. 2011). Terry does not contest this assertion. Neutra also maintains that mandatory arbitration agreements implicate subject matter jurisdiction, which any party can raise at any time.

In the Second Appeal (No. 3:18-CV-1822-D), appellant Highland[17] contends that the bankruptcy court erred by denying the Arbitration Motion and approving the Break-Up Fee and Expense Reimbursement.[18]

In the Third Appeal (No. 3:19-CV-0291-D), appellants Highland and Neutra contend that the bankruptcy court erred by denying the Arbitration Motion; confirming the Plan while the appeal of the orders for relief was still pending; confirming the Plan even though the statutory requirements of 11 U.S.C. § 1129 were not met; and entering the Temporary Injunction. HCLOF submitted a separate brief in the Third Appeal, arguing that the Temporary Injunction is beyond the constitutional authority of the bankruptcy court, is overbroad, and is not supportable under the four-part preliminary-injunction test.

On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third Appeal.

The appeals and Acis' motion are before the court for decision.

II

"The court reviews the bankruptcy court's conclusions of law *de novo*, but reviews its fact findings only for clear error." *In re Nary*, 253 B.R. 752, 756 (N.D. Tex. 2000)

---

[17]HCLOF is also named as an appellant in the Second Appeal, but it did not submit or join in any briefing.

[18]The notice of appeal in the Second Appeal also challenges the bankruptcy court's decisions to deny a preliminary injunction requested by HCLOF and to grant the Trustee's request for a preliminary injunction in the Trustee Adversary. These appeals were separately docketed and subsequently dismissed.

(Fitzwater, J.) (quoting *In re ICH Corp.*, 230 B.R. 88, 91 n.10 (N.D. Tex. 1999) (Fitzwater, J.)). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *In re Johnson Sw., Inc.*, 205 B.R. 823, 827 (N.D. Tex. 1997) (Fitzwater, J.) (quoting *In re Placid Oil Co.*, 158 B.R. 404, 412 (N.D. Tex. 1993) (Fitzwater, J.)). "If the trier of fact's account of the evidence is plausible in light of the record viewed in its entirety, the appellate court may not reverse it." *Id.* (quoting *Placid Oil Co.*, 158 B.R. at 412). "[T]his court does not find facts. Neither is it free to view the evidence differently as a matter of choice." *Id.* (alteration in original) (quoting *Placid Oil Co.*, 158 B.R. at 412). "The bankruptcy judge's unique perspective to evaluate the witnesses and to consider the entire context of the evidence must be respected." *Id.* (quoting *Placid Oil Co.*, 158 B.R. at 412) (internal quotation marks omitted).

In reviewing matters committed to the bankruptcy court's discretion—such as whether to approve a break-up fee and expense reimbursement—the court applies an abuse of discretion standard. *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 205 (3d Cir. 2010). "To constitute an abuse of discretion, the [bankruptcy] court's decision must be either premised on an application of the law that is erroneous, or on an assessment of the evidence that is clearly erroneous." *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000).

III

In the First Appeal, appellee Terry contends that appellant Neutra lacks standing to appeal the orders for relief.[19]

A

1

"Bankruptcy courts are not authorized by Article III of the Constitution, and as such are not presumptively bound by traditional rules of judicial standing." *In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004) (citing *Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 210 n.18 (5th Cir. 1994)).  But there are still limits on who may appeal a bankruptcy court order.  *See In re Technicool Sys., Inc.*, 896 F.3d 382, 385 (5th Cir. 2018).  Before 1978, those limits were provided by the Bankruptcy Act, which granted appellate standing only to "person[s] aggrieved" by a bankruptcy court order.  *Coho Energy*, 395 F.3d at 202 (quoting 11 U.S.C. § 67(c) (1976)).  Congress repealed the relevant statutory provision when it passed the Bankruptcy Reform Act of 1978, but courts—including the Fifth Circuit—nonetheless still apply the person aggrieved test to bankruptcy appeals.  *See id.*  Because "[b]ankruptcy cases often involve numerous parties with conflicting and overlapping interests," and "[a]llowing each and every party to appeal each and every order

---

[19]The other appellants in the First Appeal have not briefed the issue of standing.  They have therefore failed to meet their burden to assert that they have standing.  *See Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 208 (5th Cir. 1994) ("[T]he putative appellant shoulders the burden of alleging facts sufficient to demonstrate that it is a proper party to appeal.").

would clog up the system and bog down the courts," it is necessary for courts to limit who may appeal any given order. *Technicool Sys.*, 896 F.3d at 385.

The person aggrieved test "is 'more exacting' than the test for Article III standing." *Id.* (quoting *In re Delta Produce, L.P.*, 845 F.3d 609, 619 (5th Cir. 2016)). "Rather than showing the customary 'fairly traceable' causal connection, a bankruptcy appellant must instead show that he was 'directly and adversely affected pecuniarily by the order of the bankruptcy court.'" *Id.* (footnotes omitted) (first quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), then quoting *Fortune Nat. Res. Corp. v. U.S. Dep't of Interior*, 806 F.3d 363, 366 (5th Cir. 2015)).[20]

2

Equally important to deciding whether Neutra has standing is the "shareholder standing rule," which is "a longstanding equitable restriction that generally prohibits shareholders from initiating actions to enforce the rights of the corporation" absent special circumstances. *Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990). The doctrine derives from the third-party standing rule: "the plaintiff generally must assert his

_____

[20]Some courts have imposed an additional prerequisite: that the appellant have attended and objected at the underlying bankruptcy proceedings. *See, e.g., In re Palmaz Sci., Inc.*, 262 F.Supp.3d 428, 435 (W.D. Tex. 2017); *In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 693-94 (Bankr. W.D. Tex. 2011) (quoting *In re Ray*, 597 F.3d 871, 874 (7th Cir. 2010)). But other courts have held that appearance and objection are not indispensable to appellate standing. *See In re Point Ctr. Fin., Inc.*, 890 F.3d 1188, 1192-93 (9th Cir. 2018); *In re Urban Broad. Corp.*, 401 F.3d 236, 244 (4th Cir. 2005). The Fifth Circuit has not yet decided the question. *See Palmaz*, 262 F.Supp.3d at 434. This court need not decide the issue because it disposes of the question of Neutra's standing on other grounds.

own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); *see In re Troutman Enters., Inc.*, 286 F.3d 359, 364 (6th Cir. 2002). This court has recognized that "[u]nder federal common law [and] Texas law . . . only a corporation and not its shareholders, not even sole shareholders, can complain of an injury sustained by, or a wrong done to, the corporation." *Rigco, Inc. v. Rauscher Pierce Refsnes, Inc.*, 110 F.R.D. 180, 183 (N.D. Tex. 1986) (Fitzwater, J.). Although the rule is phrased in terms of corporations and shareholders, it applies with equal force to limited partnerships like Acis LP. *See CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 122-23 (2d Cir. 2013) (applying federal common law); *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 220-22 (5th Cir. 1994) (applying Texas law); *see also In re A.S. Acquisition Corp.*, 56 Fed. Appx. 415, 416 (9th Cir. 2003) (memorandum) (holding that limited partner lacked standing to appeal bankruptcy court order that affected partnership property). It also applies to limited liability companies like Acis GP. *See Heyer v. Schwartz & Assocs. PLLC*, 319 F.Supp.3d 299, 304-05 (D.D.C. 2018) (applying federal common law); *Schoen v. Underwood*, 2012 WL 13029591, at *4 (W.D. Tex. May 15, 2012) (applying Texas law).

The Supreme Court has "treated standing as consisting of two related components: the constitutional requirements of Article III and nonconstitutional prudential considerations." *Franchise Tax Bd.*, 493 U.S. at 335. The shareholder standing rule falls within the latter category, and thus can operate to bar a lawsuit even if Article III standing is satisfied. *See id.* at 336. Recently, the Supreme Court called into question the continuing vitality of

prudential standing, observing that it is in tension with the principle that "a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)) (internal quotation marks omitted); *see also Excel Willowbrook, L.L.C. v. JP Morgan Chase Bank, Nat'l Ass'n*, 758 F.3d 592, 603 n.34 (5th Cir. 2014) ("[T]he continued vitality of prudential 'standing' is now uncertain in the wake of the Supreme Court's recent decision in *Lexmark*[.]"). But the Fifth Circuit has since reaffirmed the third-party standing doctrine in particular. *See Superior MRI Servs., Inc. v. All. Healthcare Servs., Inc.*, 778 F.3d 502, 506 (5th Cir. 2015). The doctrine therefore remains binding in this circuit.

The court is aware of no binding precedent requiring it to apply the shareholder standing rule in the context of a bankruptcy appeal, but other courts have done so. *See, e.g., In re Heyl*, 770 F.3d 729, 730 (8th Cir. 2014) (per curiam); *In re AFY*, 734 F.3d 810, 822-23 (8th Cir. 2013); *A.S. Acquisition Corp.*, 56 Fed. Appx. at 416; *In re Troutman Enters.*, 286 F.3d at 365; *In re Dein Host, Inc.*, 835 F.2d 402, 404-06 (1st Cir. 1987); *Rose v. Logan*, 2014 WL 1236008, at *5-7 (D. Md. Mar. 25, 2014). This court concludes that it should do so as well, for at least two reasons.

First, the person aggrieved test already includes a version of the third-party standing rule. It requires that the appellant be "*directly* and adversely affected pecuniarily by the order of the bankruptcy court." *Technicool Sys.*, 896 F.3d at 385 (emphasis added) (quoting *Fortune Nat. Res. Corp.*, 806 F.3d at 366). "An 'indirect financial stake' in another's claims

- 21 -

is insufficient for standing." *In re The Watch Ltd.*, 257 Fed. Appx. 748, 749 (5th Cir. 2007) (per curiam) (quoting *Rohm*, 32 F.3d at 208).

Second, the person aggrieved doctrine is itself a creature of prudential standing—it is distinct from, and narrower than, constitutional standing, and it is justified by practical considerations. *See Coho Energy*, 395 F.3d at 202 ("To prevent unreasonable delay, courts have created an *additional* prudential standing requirement in bankruptcy cases: The appellant must be a 'person aggrieved' by the bankruptcy court's order." (quoting *In re P.R.T.C., Inc.*, 177 F.3d 774, 777 (9th Cir. 1999))); *see also Technicool Sys.*, 896 F.3d at 384-86 (distinguishing constitutional standing from bankruptcy standing, and offering prudential justifications for the latter). The policy underlying the person aggrieved doctrine would be well-served by including within it a third-party standing or shareholder standing rule. Without such a limitation, any one of a debtor's numerous shareholders could separately appeal bankruptcy court orders affecting the value of the debtor—thus resulting in "umpteen appeals raising umpteen issues." *Technicool Sys.*, 896 F.3d at 384. Neutra does not argue that the shareholder standing rule is inapplicable to bankruptcy appeals generally. Instead, Neutra maintains that it is asserting a direct, rather than a derivative, interest in the orders for relief. The court therefore holds that the shareholder standing rule applies in the context of bankruptcy appeals.

Although no party cites it, the court is aware of one Fifth Circuit decision that allowed a debtor's majority shareholder to appeal an order of the bankruptcy court. In *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir. 1977), *superseded by statute on other*

*grounds as recognized by In re Woerner*, 783 F.3d 266, 274 (5th Cir. 2015) (en banc),[21] the Fifth Circuit authorized a debtor's majority shareholder to appeal an order awarding attorney's fees to the trustee's attorneys (one of whom was himself the trustee). But as the *First Colonial* panel was careful to point out, the case involved unique circumstances. *See id.* at 1297 ("Although the attorneys and the trustee are correct in stating that in the usual case the bankrupt and its shareholders do not have an interest in the disposition of the assets of the estate . . . this is hardly the usual case."). The appeal involved an issue on which the interests of the trustee and the debtor diverged, because "[w]here the trustee serves as his own attorney there is no disinterested trustee to ensure that the attorney is paid only for professional services necessary to the administration of the estate." *Id.* Thus the panel made an exception: it allowed the shareholder to appeal, thereby "refusing to permit [the trustee] to use his position as trustee to prevent [the shareholder] from contesting the size of his attorneys' fee." *Id.* There are no such circumstances present here: the Trustee lacks a similarly-direct "personal financial stake" in the orders for relief, and he is not using his special position to insulate a favorable order from review. *Cf. AFY*, 734 F.3d at 823 (distinguishing *First Colonial* because trustee lacked personal financial stake in outcome of appealed orders). *First Colonial* therefore does not prevent this court from applying the shareholder standing rule to a bankruptcy appeal.

---

[21]Although *First Colonial* was decided before the passage of the Bankruptcy Reform Act of 1978, the "person aggrieved" test applied by the courts post-1978 was taken directly from pre-1978 jurisprudence. *See Coho Energy*, 395 F.3d at 202. *First Colonial*'s analysis is therefore still relevant.

## B

Neutra asserts four different interests in the orders for relief. None of these interests suffices to give Neutra standing to appeal.

Neutra contends that it "is watching its interest in Acis being decimated by administrative expenses." Neutra First Appeal Br. 19. In other words, Neutra's ownership interest in Acis is losing value as a result of the inherent expenses of bankruptcy. Under the shareholder standing rule, however, this interest is quintessentially derivative of Acis' own interests, and therefore cannot confer standing. *See, e.g., Stevens v. Lowder*, 643 F.2d 1078, 1080 (5th Cir. Unit B Apr. 1981) ("Plaintiffs' individual injury arises only from the loss in value of their stock as a result of injury to the corporation. Under these circumstances, plaintiffs have no independent cause of action."). The First Circuit rejected a nearly-identical argument in *Dein Host*, 835 F.2d 402. It held that an appellant lacked standing where his only interest in the bankruptcy court order was "that his beneficial interest in [another entity]—his stock—[was] in jeopardy and subject to shrinkage." *Id.* at 405. In so concluding, the court relied on the principle that "[t]he fact that the injury may indirectly harm a stockholder by diminishing the value of his corporate shares does not bestow upon him a right to sue on his own behalf." *Id.* at 405-06 (quoting *Papilsky v. Berndt*, 466 F.2d 251, 255 (2d Cir. 1972)). Thus even if Acis loses value as a result of its plunge into bankruptcy, Neutra cannot appeal on this basis.

Neutra also posits that it "has lost its right to protect its interest [in Acis] via control of [Acis]." Neutra First Appeal Br. 19. This interest is insufficient to confer standing

because losing control over an entity is not, in itself, a *pecuniary* injury. *See Technicool Sys.*, 896 F.3d at 385 (requiring that appellant be "directly and adversely affected *pecuniarily* by the order of the bankruptcy court" (emphasis added)); *see also Rose*, 2014 WL 1236008, at *5-7 (holding that shareholder standing rule applies with full force to entity's *sole* equity owner). Control rights may enhance the value of Neutra's ownership interest, or may allow Neutra to protect the value of that interest via advantageous business decisions. But, as the court has already discussed, any diminishment in the value of Neutra's interest in Acis does not confer standing on Neutra.

Neutra also asserted, at the time it filed its briefing in the First Appeal, that it would soon "be forced to partner with Oaktree against its wishes, and may be completely divested from its equity interests without its consent." Neutra First Appeal Br. 19-20. But this outcome was by no means an inevitable result of the *orders for relief*. The person aggrieved test does not take into account every injury caused by the bankruptcy case as a whole, but instead asks whether "the *order* of the bankruptcy court . . . directly and adversely affect[s] the appellant pecuniarily." *Fortune Nat. Res. Corp.*, 806 F.3d at 367. And "bankruptcy standing requires 'a higher causal nexus between act and injury'" than does traditional Article III standing. *Technicool Sys.*, 896 F.3d at 385-86 (quoting *Fortune Nat. Res. Corp.*, 806 F.3d at 366). Thus although the orders for relief created the possibility that Neutra might suffer harm in the future, Neutra was not aggrieved by them for standing purposes because "[the] speculative prospect of harm is far from a direct, adverse, pecuniary hit." *Id.* at 386; *see also id.* at 384-86 (concluding that equity owner was not aggrieved by order allowing

trustee to employ special counsel, even though special counsel's purpose was to pierce the corporate veil to reach equity owner's other companies and assets).

Of course, the future harms identified by Neutra in the First Appeal did actually come to pass: the bankruptcy court appointed first Oaktree, and then Brigade, as the new service provider for Acis, and later divested Neutra of its equity interest in Acis. But this court cannot take these events into account in its analysis of the First Appeal. A district court hearing a bankruptcy appeal may only consider information if it is "part of the record before the bankruptcy court" or if it "meets the narrow purpose of judicial notice." *In re SI Restructuring Inc.*, 480 Fed. Appx. 327, 329 (5th Cir. 2012) (per curiam). The subsequent events that are asserted to have injured Neutra are not part of the record in the First Appeal. No party has asked this court to take judicial notice of any subsequent bankruptcy court orders in the First Appeal, and the court has no duty to do so *sua sponte*.[22] Moreover, Neutra would lack standing even if the court *did* take these events into account. That a once-speculative harm actually came to pass does not mean that the harm was initially *likely* to happen—so Neutra would still fail to show the "higher causal nexus between act and injury" that the person aggrieved test demands. *Technicool Sys.*, 896 F.3d at 385-86 (quoting *Fortune Nat. Res. Corp.*, 806 F.3d at 366); *cf. Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 101 (N.Y. 1928) (finding no liability for negligence where, *ex ante*, "there was nothing in the

---

[22]The Fifth Circuit has indicated that when no party asks the district court to take judicial notice of a fact, and the district court does not do so *sua sponte*, the Fifth Circuit is unlikely to do so for the first time on appeal. *See United States v. Herrera-Ochoa*, 245 F.3d 495, 502 & n.6 (5th Cir. 2001) (citing cases).

situation to suggest to the most cautious mind" that defendant's actions would result in harm to plaintiff, even though harm actually occurred).

The court therefore dismisses the First Appeal, i.e., all the appeals of the orders for relief.

## C

The court's conclusion that Neutra lacks standing[23] is buttressed by the fact that the bankruptcy court properly denied Neutra's motion to intervene.[24]

## 1

Neither Neutra nor Terry has substantially briefed the question whether the bankruptcy court erred by denying Neutra's motion to intervene. Neutra contends that the ruling on its motion to intervene has no bearing on whether it can appeal as a person

---

[23]This conclusion does not mean that *no one* has standing to appeal. The Trustee likely could have appealed the orders for relief on Acis' behalf had he believed the orders were not in the best interests of the estates. *See In re C.W. Mining Co.*, 636 F.3d 1257, 1261-66 (10th Cir. 2011); *see also* 11 U.S.C. § 323(a) ("The trustee in a case under this title is the representative of the estate.").

[24]The parties agree that this court has jurisdiction over the orders denying intervention because they are interlocutory orders that merged into the orders for relief, which are final orders for the purposes of 28 U.S.C. § 158(a)(1). *See In re Manuel Mediavilla, Inc.*, 568 B.R. 551, 566 (B.A.P. 1st Cir. 2017); *In re Marciano*, 459 B.R. 27, 36 (B.A.P. 9th Cir. 2011). Neutra only asserts that it has standing to appeal the orders for relief; it does not contend that it has standing to appeal independently the orders denying intervention. *Cf. Rohm*, 32 F.3d at 208 ("[T]he putative appellant shoulders the burden of alleging facts sufficient to demonstrate that it is a proper party to appeal."). Thus even though the court concludes—in the context of this standing analysis—that the orders denying intervention were correctly decided, it does not affirm them. Instead, it dismisses the entire First Appeal for lack of standing.

aggrieved; Terry, meanwhile, maintains that the bankruptcy court's decision was correct, but also contends that any error was harmless because Neutra had no intention of participating in the trial on the involuntary petitions. The court is not persuaded, however, that the question is irrelevant.

Some courts have suggested that the bankruptcy court's proper denial of a motion to intervene is dispositive of the movant's right to appeal. *See, e.g., In re Living Hope Sw. Med. Servs., LLC*, 598 Fed. Appx. 467, 467 (8th Cir. 2015) (per curiam) (concluding that appellant lacked standing because bankruptcy court correctly denied his motion to intervene); *In re Thompson*, 965 F.2d 1136, 1140-46 & n.9 (1st Cir. 1992) (equating person aggrieved test with the test for intervention under Rule 7024, and concluding that because bankruptcy court properly denied motion to intervene in adversary proceeding, appellant lacked standing to appeal judgment); *In re S. State St. Bldg. Corp.*, 140 F.2d 363, 367 (7th Cir. 1943) ("If one who has a right to intervene, but does not, has no standing to appeal, a fortiori, one who has no right to intervene, and does not, has no standing to appeal."); *see also In re Blair*, 2016 WL 8608454, at *5 (D. Colo. Aug. 24, 2016) ("One might expect that [the person aggrieved] doctrine would not apply to a party that sought and was denied intervention. Or, at a minimum, it seems incongruous to permit a party to file an unsuccessful motion to intervene and nonetheless be permitted to appeal under the persons aggrieved doctrine and immediately attack the Bankruptcy Court's substantive rulings, rather than first challenging the denial of intervention."). Other courts disagree. *See Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 747 (2d Cir. 1991) (holding that "[Rule 2018,] governing permissive

intervention, does not limit the rights of a 'person aggrieved' to be heard" on appeal).

It is also possible that, had Neutra been allowed to intervene, it would have had standing to appeal by virtue of its intervention alone. *See First Colonial*, 544 F.2d at 1296-98 (finding that appellant was a person aggrieved, and then adding, as alternative ground for its holding, that "[appellant] has standing to appeal from all of the fee awards because the bankruptcy judge granted its motion to intervene [under what is now Rule 7024] without qualifying its right to participate in the proceeding"); *see also Int'l Trade Admin.*, 936 F.2d at 747 (stating that permissive intervention under Rule 2018 "provides a formal mechanism that expands the right to be heard to a wider class than those who qualify under the 'person aggrieved' standard"). *But see Troutman Enters.*, 286 F.3d at 363-64 (holding that parties who were permitted to intervene in bankruptcy proceeding nonetheless lacked appellate standing because they were not persons aggrieved).

Because the bankruptcy court's decision to deny intervention could affect Neutra's standing to bring the present appeal, the court will consider the merits of Neutra's appeal of that decision.

2

"A ruling denying intervention of right is reviewed *de novo*." *St. Bernard Par. v. Lafarge N. Am., Inc.*, 914 F.3d 969, 973 (5th Cir. 2019) (quoting *Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir. 1996) (en banc)). Although generally "the timeliness of an intervention motion is reviewed for abuse of discretion," if the bankruptcy court did not explain its ruling on timeliness, review is *de novo*. *See id.* (citing *Sommers v. Bank of Am.,*

*N.A.*, 835 F.3d 509, 513 (5th Cir. 2016)). The court reviews the denial of a motion for permissive intervention for "clear abuse of discretion," and will disturb the bankruptcy court's ruling "only under extraordinary circumstances." *Id.* (quoting *Edwards*, 78 F.3d at 995).

Neutra sought intervention as of right under Rule 1018, which provides that Rule 7024 applies in proceedings to contest an involuntary petition. Rule 7024, in turn, states that "[Fed. R. Civ. P. 24] applies in adversary proceedings."

> A party is entitled to an intervention of right under Rule 24(a)(2) if (1) the motion to intervene is timely, (2) the interest asserted by the potential intervenor is related to the action, (3) that interest may be impaired or impeded by the action, and (4) that interest is not adequately represented by the existing parties.

*Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 2012 WL 2133667, at *1 (N.D. Tex. June 12, 2012) (Fitzwater, C.J.) (citing *In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 247 (5th Cir. 2009); *Sierra Club v. Espy*, 18 F.3d 1202, 1204-05 (5th Cir. 1994)), *rev'd on other grounds*, 747 F.3d 275 (5th Cir. 2014), *aff'd*, ___ U.S. ___, 135 S. Ct. 2507 (2015). "Failure to satisfy any one requirement precludes intervention of right." *Haspel & Davis Milling & Planting Co. v. Bd. of Levee Comm'rs*, 493 F.3d 570, 578 (5th Cir. 2007).

Neutra also sought permissive intervention under Rule 2018. That rule provides that "after hearing on such notice as the court directs and for cause shown, the court may permit any interested entity to intervene generally or with respect to any specified matter." Rule 2018(a).

In deciding whether to permit intervention under Rule 2018(a), courts look to various factors, including (1) whether the moving party has an economic or similar interest in the matter; (2) whether the interest of the moving party [is] adequately represented by the existing parties; [(3)] whether the intervention will cause undue delay to the proceedings; and (4) whether the denial of the movant's request will adversely affect their interest.

*Pasternak & Fidis, P.C. v. Wilson*, 2014 WL 4826109, at *6 (D. Md. Sept. 23, 2014) (collecting cases). Thus "[t]he standards under Rule 2018 and [Rule] 24 overlap." *In re Adilace Holdings, Inc.*, 548 B.R. 458, 462 (Bankr. W.D. Tex. 2016). "The decision whether to allow intervention is wholly discretionary under Rule 2018 . . . even where each required element is met." *Id.* at 463 (citing *Staley v. Harris County*, 160 Fed. Appx. 410, 414 (5th Cir. 2005) (per curiam); *In re Durango Ga. Paper Co.*, 336 B.R. 594, 596 (Bankr. S.D. Ga. 2005)).

3

Neutra was not entitled to intervention of right in the trial of the involuntary petitions because it did not have a sufficiently direct interest in the proceedings. The only interest that Neutra asserted was its property interest in Acis. But in the intervention context, "[t]he term 'interest' is narrowly read to mean a *direct* and substantial interest in the proceedings . . . that the substantive law recognizes as belonging to or being owned by *the party seeking intervention*." *Rigco*, 110 F.R.D. at 183 (emphasis added). Accordingly, the shareholder standing rule applies to Rule 24(a) motions to intervene. *See id.* at 183-84. Neutra's property interest in the alleged debtors therefore could not support Neutra's claimed right to

intervene in the trial on the involuntary petitions. *See supra* § III(B). Because one of the four Rule 24(a) factors was not met, the bankruptcy court did not err by denying Neutra's motion to intervene as of right. *See Haspel*, 493 F.3d at 578.

For similar reasons, the bankruptcy court did not abuse its discretion by denying Neutra permissive intervention under Rule 2018. This is because Neutra lacked a sufficiently direct interest in the proceedings. And even if Neutra had such an interest, this court still would not disturb the bankruptcy court's ruling. This court reviews the bankruptcy court's denial of a Rule 2018 motion under a deferential standard—the bankruptcy court has discretion to deny such a motion even if all four factors are met. *See Adilace Holdings*, 548 B.R. at 463; *see also St. Bernard*, 914 F.3d at 973 (providing that orders as to permissive intervention are reviewed for clear abuse of discretion). Neutra offers no argument on appeal that the bankruptcy court committed a clear abuse of its discretion by denying its motion. *Cf. Brinkmann v. Dall. Cty. Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987) (holding that arguments not briefed on appeal are deemed abandoned). In the absence of such an argument, the court will not disturb the bankruptcy court's ruling.

## IV

Neutra argues in the First Appeal that, regardless whether it has standing to appeal the orders for relief, it can challenge the bankruptcy court's denial of the Arbitration Motion because mandatory arbitration agreements implicate the court's subject matter jurisdiction. The appellants in the Second Appeal and Third Appeal make the same argument, and contend that every subsequent order entered by the bankruptcy court is void for lack of

subject matter jurisdiction.

The Fifth Circuit recently reiterated that it has not yet decided the question whether a dismissal based on an arbitration provision is a dismissal for lack of subject matter jurisdiction. *See McDonnel Grp., L.L.C. v. Great Lakes Ins. SE, UK Branch*, 923 F.3d 427, 430 n.5 (5th Cir. 2019); *see also McGee v. W. Express, Inc.*, 2016 WL 1622632, at *2 (N.D. Tex. Apr. 5, 2016) (Horan, J.) (explaining that the Fifth Circuit has not yet decided the issue), *rec. adopted*, 2016 WL 1627662, at *1 (N.D. Tex. Apr. 22, 2016) (Kinkeade, J.). Neutra relies, however, on another Fifth Circuit opinion, *Gilbert v. Donahoe*, 751 F.3d 303 (5th Cir. 2014), in which the panel stated: "We have held that a district court lacks subject matter jurisdiction over a case and should dismiss it pursuant to Federal Rule of Civil Procedure 12(b)(1) when the parties' dispute is subject to binding arbitration." *Id.* at 306. The *Gilbert* panel cited two supporting cases in a footnote: *Ballew v. Continental Airlines, Inc.*, 668 F.3d 777 (5th Cir. 2012), and *Omni Pinnacle, LLC v. ECC Operating Services, Inc.*, 255 Fed. Appx. 24 (5th Cir. 2007) (per curiam). In both of these supporting cases the Fifth Circuit affirmed a district court's dismissal of a case under Rule 12(b)(1) pursuant to an arbitration agreement. The *Gilbert* opinion also acknowledged precedent indicating that the issue was previously unsettled. *See Gilbert*, 751 F.3d at 306 n.1 (citing *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 472 n.3 (5th Cir. 2010) ("Our court has not previously definitively decided whether Rule 12(b)(1) or Rule 12(b)(3) is the proper rule for motions to dismiss based on an arbitration or forum-selection clause.")). Thus *Gilbert*—if read in a vacuum—appears to settle the issue in a precedential decision.

But in *Ruiz v. Donahoe*, 784 F.3d 247 (5th Cir. 2015) (on petition for rehearing), Judge Owen—who authored *Gilbert* just one year before—wrote for the panel that "[a]lthough in *Gilbert* we spoke in terms of subject-matter jurisdiction, we used the term imprecisely." *Id.* at 249. The *Ruiz* panel observed that whereas subject matter jurisdiction can be raised at any time and cannot be waived by the parties, a party *can* waive its right to compel arbitration. *See id.* And "[i]f a dispute is subject to mandatory grievance and arbitration procedures, then the proper course of action is usually to stay the proceedings pending arbitration." *Id.* Thus "agreements to arbitrate implicate forum selection and claims-processing rules *not subject matter jurisdiction*." *Id.* at 250 (emphasis added).

This court is persuaded by the reasoning of *Ruiz* and follows *Ruiz*'s explanation that the *Gilbert* panel was imprecise when it spoke in terms of subject matter jurisdiction. It is well-established in the Fifth Circuit that a party can waive its right to compel arbitration. *See, e.g., Petroleum Pipe Ams. Corp. v. Jindal Saw, Ltd.*, 575 F.3d 476, 480 (5th Cir. 2009); *Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 577 (5th Cir. 1991); *Tenneco Resins, Inc. v. Davy Int'l, AG*, 770 F.2d 416, 420 (5th Cir. 1985). It is equally well-established that a party *cannot* waive challenges to the court's subject matter jurisdiction; the issue can be raised at any time by any party or by the court *sua sponte*. *See, e.g., Simon v. Wal-Mart Stores, Inc.*, 193 F.3d 848, 850 (5th Cir. 1999). Moreover, in the Fifth Circuit a court may order a stay pending arbitration instead of dismissing a case outright. *See, e.g., Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 662 (5th Cir. 1995); *see also* 9 U.S.C. § 3 (authorizing courts to grant stays pending arbitration). But when a court lacks subject matter jurisdiction over a

controversy, it cannot enter a stay order—or *any* order besides an order dismissing the case. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 434 (2007) ("[O]nce a court determines that jurisdiction is lacking, it can proceed no further and must dismiss the case on that account."). Thus if the *Gilbert* panel actually held that a dismissal based on an arbitration clause is jurisdictional, then it impliedly overruled many years of precedent set by many prior panels. Under the Fifth Circuit's rule of orderliness, however, the *Gilbert* panel lacked the power to do so. *See, e.g., Odle v. Flores*, 683 Fed. Appx. 288, 289 (5th Cir. 2017) (per curiam) ("[U]nder the rule of orderliness, to the extent that a more recent case contradicts an older case, the newer language has no effect." (alteration in original) (quoting *Arnold v. U.S. Dep't of Interior*, 213 F.3d 193, 196 n.4 (5th Cir. 2000))). Fifth Circuit precedent instead supports the conclusion that a dismissal based on an arbitration agreement does *not* implicate the court's subject matter jurisdiction.

Indeed, it would be strange if parties by contract could divest a federal court of subject matter jurisdiction or confer such jurisdiction. "Only Congress may determine a lower federal court's subject-matter jurisdiction." *Kontrick v. Ryan*, 540 U.S. 443, 452 (2004) (citing U.S. Const. art. III, § 1). "[N]o action of the parties can confer subject-matter jurisdiction upon a federal court" if such jurisdiction is otherwise lacking. *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). And federal courts have long resisted attempts by private parties to manipulate their jurisdiction—including attempts to deprive courts of removal jurisdiction where that jurisdiction properly exists. *See, e.g., Smallwood v. Ill. Cent. R.R. Co.*, 385 F.3d 568, 576 (5th Cir. 2004) (en banc) ("The

doctrine of improper joinder implements our duty to not allow manipulation of our jurisdiction.").  It follows that "if a court has jurisdiction of an action, the parties cannot deprive the court thereof by contract."  17A C.J.S. *Contracts* § 309 (2019).  Parties may not, in the course of ordering their private affairs, enlarge *or shrink* Article III or the federal statutes governing subject matter jurisdiction.[25]

Nor does the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-14, mandate that a dismissal based on an arbitration agreement is a dismissal for lack of subject matter jurisdiction.  The Supreme Court has urged caution in interpreting statutory provisions to be jurisdictional.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006) ("'Jurisdiction,' this Court has observed, 'is a word of many, too many, meanings.'  This Court, no less than other courts, has sometimes been profligate in its use of the term." (citation omitted) (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 90 (1998))).  This is because calling an issue "jurisdictional" has profound consequences.  If an issue implicates the court's subject matter jurisdiction, then it cannot be waived or forfeited, and the court has a duty to raise the issue on its own; the trial judge (instead of a jury) can resolve factual disputes underlying the issue; and if subject matter jurisdiction is lacking, the court must dismiss the entire complaint.  *See id.* at 514-15.  The Supreme Court has therefore established clear interpretive rules on the subject:

_____

[25]For similar reasons, the waiver clause in the Acis LPA does not divest this court or the bankruptcy court of subject matter jurisdiction.

[i]f the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.

*Id.* at 515-16 (footnote and citation omitted).

Nothing in the FAA indicates that Congress intended arbitration agreements to divest federal courts of subject matter jurisdiction. To the contrary, the FAA authorizes courts to issue orders that would be beyond the power of a court that lacks jurisdiction. *See Sinochem Int'l*, 549 U.S. at 434. For instance, courts must, in certain circumstances, issue orders staying their proceedings pending arbitration, *see* 9 U.S.C. § 3; orders compelling recalcitrant parties to submit to arbitration, *see id.* § 4; orders appointing an arbitrator, *see id.* § 5; and orders compelling witnesses to appear before an arbitrator, *see id.* § 7. Thus the text of the FAA—far from containing a clear statement that arbitration agreements are jurisdictional—suggests instead that the opposite is true. The court therefore concludes that Congress did not intend for dismissals based on arbitration agreements to be dismissals for lack of subject matter jurisdiction.[26]

---

[26]Neutra contends in the First Appeal that the Acis LPA's arbitration clause deprived Terry of *standing*, and that a creditor who lacks *standing* cannot confer subject matter jurisdiction on the bankruptcy court by filing an involuntary petition. But "[s]tanding is a species of subject matter jurisdiction." *In re Rhinesmith*, 450 B.R. 630, 631 (Bankr. W.D. Tex. 2011) (citing *Cadle Co. v. Neubauer*, 562 F.3d 369, 371 (5th Cir. 2009)). To conclude that arbitration agreements do not implicate a court's subject matter jurisdiction is also to conclude that they do not implicate standing. Thus Neutra's circuitous logic does not allow it to escape the court's conclusion on this issue.

Because the bankruptcy court's order denying the Arbitration Motion does not implicate subject matter jurisdiction, it can only be challenged by a party with standing. Neutra lacks standing to do so in the First Appeal. *See supra* § III. In the Second and Third Appeals, the appellants who challenge the order do not contend that they have standing to do so; instead, they rely on what they maintain is the jurisdictional nature of the order. They have therefore failed to carry their burden to establish standing. *See Rohm*, 32 F.3d at 208. Thus the court will not consider the merits of appellants' challenges to the bankruptcy court's order denying the Arbitration Motion.

## V

Highland argues in the Second Appeal that the Break-Up Fee does not satisfy the requirements of 11 U.S.C. § 503, which governs administrative expenses; the Break-Up Fee is unreasonably large; and the Expense Reimbursement was not a reasonable exercise of the Trustee's business judgment under 11 U.S.C. § 363(b).[27]

### A

The court first considers whether the bankruptcy court abused its discretion by finding that the Break-Up Fee satisfies § 503(b)(1)(A).[28]

---

[27] As a creditor of the estates, Highland has standing to appeal the order approving the Break-Up Fee and Expense Reimbursement because that order disposes of estate assets. *See, e.g., In re Gucci*, 126 F.3d 380, 388 (2d Cir. 1997). Neither Oaktree nor the Trustee contends otherwise.

[28] The parties do not dispute that § 503 applies to the bankruptcy court's decision to approve a break-up fee. *See In re ASARCO, L.L.C.*, 650 F.3d 593, 602 (5th Cir. 2011) (suggesting, in *dicta*, that § 503 is "the proper channel for requesting payment" of a break-up

In bankruptcy, administrative expenses—such as the "actual and necessary costs and expenses of preserving the estate"—are given priority over other non-secured claims in the distribution of the estate. *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir. 2001). "In order to qualify as an 'actual and necessary cost' under section 503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee that benefi[t]ed the estate." *Id.* (citing *In re TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992)). Such claims "generally stem from voluntary transactions with third parties who lend goods or services necessary to the successful reorganization of the debtor's estate." *Id.* "Crucial to satisfying the § 503 test is that the estate receive a 'discernible benefit' as a result of the expenditure." *In re ASARCO LLC*, 441 B.R. 813, 824 (S.D. Tex. 2010) (quoting *Jack/Wade Drilling*, 258 F.3d at 387), *aff'd*, 650 F.3d 593 (5th Cir. 2011); *see also In re DeSardi*, 340 B.R. 790, 799 (Bankr. S.D. Tex. 2006) ("The court's administrative expense inquiry centers upon whether the estate has received an *actual benefit, as opposed to the loss a creditor might experience*[.]" (quoting *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 866 (4th Cir. 1994))). The claimant bears the burden of proving by a preponderance of the evidence that its claim qualifies as an administrative expense. *See TransAmerican*, 978 F.2d at 1416. Once the claimant has established a prima facie case, the burden of production shifts to the objector—but the burden of persuasion remains at all times upon the claimant. *See id.*

---

fee).

The bankruptcy court did not abuse its discretion by concluding that the Break-Up Fee was an actual and necessary expense that conferred a discernible benefit upon the debtors' estates. Courts have recognized that a break-up fee can confer a benefit on the estate even though the contemplated transaction with the claimant was not consummated. *See, e.g., In re Energy Future Holdings Corp.*, 904 F.3d 298, 313-14 (3d Cir. 2018) (recognizing that break-up fee can benefit estate if, *inter alia*, the "assurance of a break-up fee promote[s] more competitive bidding," or the fee "induce[s] a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely"); *In re Lamb*, 2002 WL 31508913, at *1 (Bankr. D. Md. Oct. 11, 2002) (recognizing that break-up fees are appropriate where they incentivize a "stalking horse" bidder).

Here, the primary benefit identified by the bankruptcy court was that the Break-Up Fee facilitated the plan confirmation process. Without the Break-Up Fee, the Trustee would have had no ready, willing, and able partner for the proposed Plan A transaction, because Oaktree would not have made an offer or undertaken the expense and effort of preparing for the contemplated transaction. In this respect, the present case is similar to a traditional "stalking horse" situation, where a break-up fee induces a bidder to research a potential transaction and make an initial bid. *See, e.g., Energy Future Holdings*, 904 F.3d at 313-14. Without Plan A, the bankruptcy court faced the possible "doomsday" scenario, Second Appeal R. 78, of Acis' fee-generating PMAs being rendered worthless by HCLOF's exercise of its optional redemption right. The bankruptcy court did not abuse its discretion by recognizing these benefits.

The record also reflects that the Break-Up Fee conferred other benefits on the estates, although the bankruptcy court did not expressly acknowledge them. Oaktree's initial bid was meant to start a public sale process. *Cf. Energy Future Holdings*, 904 F.3d at 313-14 (citing *In re O'Brien Envt'l Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999)) (acknowledging that break-up fees can benefit estate by initiating a public bidding process, even where claimant was eventually outbid). And the Break-Up Fee was part of a transaction by which Oaktree agreed to step into Highland's shoes as Acis LP's sub-advisory and shared services provider, for a significantly lower price than what Highland was charging.

Of course, the Break-Up Fee is unique in one significant respect: it was expressly conditioned on the bankruptcy court's approval of Plan A. Plan A was based on the doctrine of equitable subrogation, "the legal fiction through which a person or entity, the subrogee, is substituted, or subrogated, to the rights and remedies of another by virtue of having fulfilled an obligation for which the other was responsible." *Gen. Star Indem. Co. v. Vesta Fire Ins. Corp.*, 173 F.3d 946, 949-50 (5th Cir. 1999). Under the Trustee's theory, HCLOF was to be treated as a creditor of the estates on the basis of its adversary claim against the Trustee seeking specific performance of its optional redemption right. The Trustee proposed to monetize HCLOF's claim, and to satisfy that claim by paying HCLOF the sum of $100 million (provided by Oaktree). The Trustee would then, as subrogee, substitute himself as the holder of HCLOF's rights in the subordinated CLO notes. Finally, the Trustee would use his position as subrogee to transfer HCLOF's interest in the subordinated notes to Oaktree. The bankruptcy court acknowledged that "[t]he legal theories [underpinning Plan A] are not

at all clear cut and are likely to be hotly contested by [HCLOF] and Highland." Second

Appeal R. at 78. Despite this uncertainty, the bankruptcy court approved the Break-Up Fee.[29]

Break-up fees are by nature contingent upon uncertain future events. If a transaction

were sure to happen, there would be no need for a break-up fee. Highland essentially

contends that there was *too much* uncertainty here—that the bankruptcy court abused its

discretion by approving the Break-Up Fee "in the face of [a] huge execution risk and the

substantial legal authority that the Trustee's proposed transaction with Oaktree could not be

approved." Highland Second Appeal Br. 31. But Highland overstates the degree to which

the Trustee's theory was foreclosed by existing law. The bankruptcy court was aware of

authority suggesting that, in some circumstances, an entity's claim for specific performance

may be treated as a monetary claim against the bankruptcy estate under 11 U.S.C. § 101(5).

*See In re Davis*, 3 F.3d 113, 116 (5th Cir. 1993). And under New York law, which

ostensibly governs the PMAs between Acis and the CLO-SPEs, the doctrine of equitable

subrogation is interpreted

> broad[ly] enough to include every instance in which one party
> pays a debt for which another is primarily answerable and which
> in equity and good conscience should have been discharged by
> the latter, so long as the payment was made either under
> compulsion or for the protection of some interest of the party

---

[29]The bankruptcy court later decided that Plan A was unconfirmable because the Trustee could not be subrogated to the rights of an entity that did not hold a claim against the estates. The bankruptcy court concluded that HCLOF did not hold such a claim because the Equity PMA was not then in effect, and HCLOF could not sue to enforce the PMAs between Acis and the CLO-SPEs because HCLOF was not a party to, or a third-party beneficiary of, those PMAs. This decision is not part of the record in the Second Appeal.

making the payment, and in discharge of an existing liability.

*Hamlet at Willow Creek Dev. Co. v. Ne. Land Dev. Corp.*, 878 N.Y.S.2d 97, 112 (N.Y. App.

Div. 2009) (quoting *Gerseta Corp. v. Equitable Tr. Co. of N.Y.*, 150 N.E. 501, 504 (N.Y.

1926)).  The bankruptcy court was thus within its discretion to conclude that the Trustee's

theory was at least colorable.

More important, whether the benefits of the Break-Up Fee outweighed the risks is not

for this court to decide.  Unless the bankruptcy court committed a clear error of fact or

incorrectly applied the law, this court cannot disturb its decision.  *See Grigson*, 210 F.3d at

528.  There is no indication that the bankruptcy court committed such an error here.  The

bankruptcy court recognized the potential benefits *and* the potential risks of approving the

Break-Up Fee, and it properly applied the correct legal test—the § 503(b)(1)(A) standard—in

coming to its conclusion that the Break-Up Fee benefited the estate.

The principal authority on which Highland relies, *Energy Future Holdings*, is not to

the contrary.  In that case, the Third Circuit affirmed the bankruptcy court's reconsideration

of its own decision to authorize a break-up fee.  *See Energy Future Holdings*, 904 F.3d at

301.  The bankruptcy court originally approved the break-up fee on the premise that the fee

would not be paid if a certain regulatory body did not permit the proposed transaction to go

forward.  *See id.* at 304.  When the bankruptcy court learned that this premise was incorrect,

it reconsidered the order and came to a different conclusion.  *See id.* at 307.  The Third

Circuit, in affirming the bankruptcy court, *deferred to the bankruptcy court's discretion* to

weigh the potential risks and benefits of allowing the fee:

In sum, the Termination Fee provision had the potential of providing a large benefit to the estates, but it also had the possibility to be disastrous. Once it had a complete understanding, the Bankruptcy Court properly weighed the various considerations and determined that the potential benefit was outweighed by the harm that would result under predictable circumstances. In other words, the risk was so great that the Fee was not necessary to preserve the value of Debtors' estates. Having made such a determination, the Bankruptcy Court did not abuse its discretion in denying the Fee in part.

*Id.* at 315 (footnote omitted). Likewise, the bankruptcy court in the present appeal was within its discretion to conclude that the benefits of the Break-Up Fee outweighed the risks, despite the uncertainty of the Trustee's legal theory.

B

The court considers next whether the Break-Up Fee was so large as to be unreasonable.

Highland cites no binding authority for the proposition that a break-up fee that meets the requirements of § 503(b)(1)(A) must be rejected if it is "unreasonable," nor does Highland explain what test a break-up fee must pass in order to be "reasonable." *See* Highland Second Appeal Br. 32-33. Assuming *arguendo* that it would be error to approve an "unreasonable" break-up fee, the court concludes that the bankruptcy court did not err in this respect. The bankruptcy court found that the Break-Up Fee constituted roughly 2.3% of the total price that Oaktree would pay under the terms of the proposed transaction. This amount is in line with break-up fees authorized by other courts. *See, e.g., In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("Except in extremely large transactions,

break-up fees ranging from one to two percent of the purchase price have been authorized by some courts."); *see also Samjens Partners I v. Burlington Indus., Inc.*, 663 F. Supp. 614, 625 (S.D.N.Y. 1987) (approving 2% break-up fee); *In re Sea Island Co.*, 2010 WL 4393269, at *3 (Bankr. S.D. Ga. Sept. 15, 2010) (approving 3% break-up fee).

Highland contends that the relevant benchmark is not the total transaction price, but is instead the amount of money that Acis LP would retain after the transaction was complete. Applying Highland's logic, the Break-Up Fee is actually *26%* of the transaction's value. But Highland's logic does not stand up in light of the legal theory proposed by the Trustee in support of the transaction. Under Plan A, Oaktree was not purchasing HCLOF's subordinated notes outright. Rather, it was funding the proposed plan so that Acis could satisfy all of its creditors' claims—including HCLOF's liquidated claim for specific performance—in exchange for the Trustee's promise to use the doctrine of equitable subrogation to transfer the subordinated notes to Oaktree. There is no principled reason to compare the Break-Up Fee to the amount of money retained by Acis *after* paying off HCLOF's claim, but *before* paying off any other creditor's claim. Highland's unreasonableness argument lacks merit.

C

Finally, the court considers whether the bankruptcy court abused its discretion by concluding that the Expense Reimbursement was a proper exercise of the Trustee's business judgment.

Expense reimbursements are governed by 11 U.S.C. § 363(b), which incorporates a

business judgment standard. *See ASARCO*, 650 F.3d at 601-03. Section 363(b) permits a trustee, after notice and a hearing, to use, sell, or lease estate property other than in the ordinary course of business. *See id.* at 601. "In such circumstances, 'for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.'" *Id.* (quoting *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986)). "The business judgment standard in section 363 is flexible and encourages discretion." *Id.*; *see also GBL Holding Co. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005) (Lynn, J.) ("Great judicial deference is given to the Trustee's exercise of business judgment.").

The bankruptcy court acknowledged that "Oaktree has spent significant time and expense related to the [Plan A] Transaction," and that "[i]t is reasonable to anticipate that Oaktree will continue to incur additional significant time and expense." Second Appeal R. 78. The bankruptcy court found that the Expense Reimbursement, along with the Break-Up Fee, was an "essential inducement[]" for Oaktree's continuing commitment to the Plan A transaction. *Id.* Oaktree's commitment to the proposed transaction was beneficial to the estates for the reasons explained *supra* at § V(A). Thus the bankruptcy court concluded that "the Trustee has established, in his business judgment, that the Expense Reimbursement is necessary here." *Id.* at 77. The bankruptcy court did not abuse its discretion.

Highland's arguments to the contrary are unavailing. Highland contends that the Trustee lacked any reasonable business justification for allowing the Expense

Reimbursement because he knew in advance that Plan A was unconfirmable, as evidenced by his proposing Plans B and C at the same time. The court disagrees. If the Trustee knew that Plan A could not be confirmed, then he would have had *no reason* to propose it in the first place—let alone any reason to go through the effort and expense of negotiating with Oaktree. Highland also argues that Oaktree "assume[d] the risk" of losing any money it spent in relation to the Plan A transaction, because Oaktree was experienced enough to know that Plan A could not be approved. Highland Second Appeal Reply 16. But the question is not whether Oaktree assumed any particular risk; the question is whether the Trustee had an "articulated business justification for" the Expense Reimbursement. *ASARCO*, 650 F.3d at 601 (quoting *Cont'l Air Lines*, 780 F.2d at 1226). The bankruptcy court did not abuse its discretion by concluding that he did.

The court therefore affirms the bankruptcy court's order approving the Break-Up Fee and Expense Reimbursement.

## VI

In the Third Appeal, Highland and Neutra contend that the filing of the First Appeal divested the bankruptcy court of subject matter jurisdiction to confirm the Plan.

## A

"It is a fundamental tenet of federal civil procedure that—subject to certain, defined exceptions—the filing of a notice of appeal from the final judgment of a trial court divests the trial court of jurisdiction and confers jurisdiction upon the appellate court." *In re Transtexas Gas Corp.*, 303 F.3d 571, 578-79 (5th Cir. 2002) (citing *Griggs v. Provident*

*Consumer Co.*, 459 U.S. 56, 58 (1982)).  "This rule applies with equal force to bankruptcy cases."  *Id.* at 579.  Thus while an appeal is pending, the bankruptcy court cannot exercise control over "those aspects of the case involved in the appeal."  *In re Scopac*, 624 F.3d 274, 280 (5th Cir. 2010) (quoting *Griggs*, 459 U.S. at 58), *modified on denial of reh'g*, 649 F.3d 320 (5th Cir. 2011).

But "the bankruptcy court retains jurisdiction to address elements of the bankruptcy proceeding that are not the subject of that appeal."  *Transtexas*, 303 F.3d at 580 n.2.  The Fifth Circuit "has specifically rejected 'the broad rule that a bankruptcy court may not consider any request which either directly or indirectly touches upon the issues involved in a pending appeal and may not do anything which has any impact on the order on appeal.'"  *Scopac*, 624 F.3d at 280 (quoting *In re Sullivan Cent. Plaza I, Ltd.*, 935 F.2d 723, 727 (5th Cir. 1991)).  Instead, the Fifth Circuit has adopted a "functional test: 'once an appeal is pending, it is imperative that a lower court not exercise jurisdiction over those issues which, although not themselves expressly on appeal, nevertheless so impact the appeal so as to interfere with or effectively circumvent the appeal process.'"  *Id.* (quoting *In re Whispering Pines Estates, Inc.*, 369 B.R. 752, 759 (B.A.P. 1st Cir. 2007)).

Where courts have held that a bankruptcy court was divested of jurisdiction to enter a subsequent order, it is usually because the subsequent order would have modified, or would have been inconsistent with, an order pending on appeal.  *See, e.g., Transtexas*, 303 F.3d at 574, 582 (holding that bankruptcy court was divested of jurisdiction to supplement plan confirmation order that was then pending on appeal); *Whispering Pines*, 369 B.R. at 760

(concluding that bankruptcy court could not issue stay relief order that essentially modified confirmed plan while plan confirmation order was pending on appeal); *In re BNP Petroleum Corp.*, 2012 WL 7620694, at *3 (S.D. Tex. Feb. 27, 2012) (observing that bankruptcy court can consider motion to set aside sale agreement, and can deny that motion, but cannot *grant* it while the order approving the sale agreement is pending on appeal); *In re Southold Dev. Corp.*, 129 B.R. 18, 19, 21 (E.D.N.Y. 1991) (invalidating order that modified reorganization plan, where plan confirmation order was already pending on appeal); *In re 710 Long Ridge Rd. Operating Co., II, LLC*, 2014 WL 1648725, at *1, *3-6 (Bankr. D.N.J. Apr. 24, 2014) (refusing to consider motion to clarify plan confirmation order that was pending on appeal, because a court "cannot take action that will alter or modify its prior order while that order is pending on appeal"); *In re New Century TRS Holdings, Inc.*, 2012 WL 2064500, at *1-3 (Bankr. D. Del. June 7, 2012) (dismissing motion for sanctions where motion essentially repackaged issues and arguments then pending in appeal of motion for reconsideration); *In re Wallace's Bookstores, Inc.*, 330 B.R. 193, 195 (Bankr. E.D. Ky. 2005) (denying adversary plaintiff's motion to dismiss claims whose resolution was then pending on appeal); *see also Wireless Agents, LLC v. Sony Ericsson Mobile Comms. AB*, 2006 WL 1189687, at *3 (N.D. Tex. May 3, 2006) (Fitzwater, J.) ("Because Wireless has appealed the court's denial of a preliminary injunction, the Federal Circuit has exclusive jurisdiction over the preliminary injunction motion, and this court cannot modify its preliminary findings of fact and conclusions of law during the pendency of the appeal."). Attempting to modify an order pending on appeal, or issuing a subsequent order that is inconsistent with the order being

appealed, circumvents the appellate process. *Cf. Scopac*, 624 F.3d at 280 (holding that a bankruptcy court cannot "interfere with or effectively circumvent the appeal process").

B

Neutra identifies three issues on appeal in the First Appeal that supposedly divested the bankruptcy court of jurisdiction to confirm the Plan: (1) whether the bankruptcy court erred by denying the Arbitration Motion; (2) whether the bankruptcy erred by not abstaining under 11 U.S.C. § 305; and (3) whether Terry filed the involuntary petitions in good faith.

The appeal of the bankruptcy court's denial of the Arbitration Motion did not divest the bankruptcy court of jurisdiction to issue further orders. In *Weingarten Realty Investors v. Miller*, 661 F.3d 904 (5th Cir. 2011), the Fifth Circuit held that the appeal of an order denying a motion to compel arbitration does not divest a district court of jurisdiction to decide the merits of a case, even though a motion to compel arbitration—if granted—would effectively end the case. *See id.* at 907-10. The *Weingarten* panel interpreted the divestiture doctrine "narrowly." *See id.* at 908-09. It reasoned that, because the denial of a motion to compel arbitration does not, as a matter of law, determine the merits of the case, the merits question is not an "aspect[] of the case involved in the appeal," and the district court may decide it. *See id.* at 909 (alteration in original) (quoting *Griggs*, 459 U.S. at 58). The Fifth Circuit rejected the Seventh Circuit's reasoning that the appeal of a motion to compel arbitration—much like the appeal of a motion to dismiss based on double jeopardy, sovereign immunity, or qualified immunity—results in an automatic stay of the proceedings below because "the appeal is to determine whether the matter should be litigated in the district court

- 50 -

at all." *Id.* at 908 (citing *Bradford-Scott Data Corp. v. Physician Comput. Network*, 128 F.3d 504, 505-06 (7th Cir. 1997)). Under *Weingarten*, because the bankruptcy court's ruling on the Arbitration Motion is separate from the merits of Plan confirmation, the appeal of that prior ruling did not divest the bankruptcy court of jurisdiction to confirm the Plan.

The reasoning of *Weingarten* applies with full force to the § 305 abstention issue. Highland and Neutra have not shown that there is any overlap, as a matter of law, between the bankruptcy court's decision to confirm the Plan and its decision not to abstain from ruling on the involuntary petitions. Thus even though the bankruptcy court's abstention decision "determine[d] whether the matter should be litigated in the [bankruptcy] court at all," *id.* at 908, the appeal of that decision did not divest the bankruptcy court of jurisdiction to confirm the Plan.

The issue of Terry's good faith in filing the involuntary petitions presents a closer question. For the bankruptcy court to confirm a plan, it must find, *inter alia*, that the plan was "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The Eleventh Circuit has held that where an involuntary petition is filed in bad faith, any subsequently-proposed reorganization plan is *necessarily* proposed in bad faith and cannot be confirmed. *See In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987); *but see In re Landing Assocs., Ltd.*, 157 B.R. 791, 812 (Bankr. W.D. Tex. 1993) ("Bank United relies on the legal standard established in several bad-faith filing cases for this proposition. However, a different legal standard is employed when evaluating good faith for plan confirmation purposes under [11 U.S.C.] § 1129(a)(3)." (citations omitted)). Under the

Eleventh Circuit's rule, the bankruptcy court's ruling that Terry filed the involuntary petitions in good faith has some bearing on its decision to confirm the Plan.

But even assuming that the Eleventh Circuit's rule applies, the court is not convinced that, under these circumstances, the First Appeal divested the bankruptcy court of jurisdiction to confirm the Plan.  In issuing the confirmation order, the bankruptcy court did not directly exercise jurisdiction over the question of Terry's good faith in filing the involuntary petitions—it did not revisit, comment upon, or supplement its earlier decision.  *See In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 680 (Bankr. S.D.N.Y. 2016) ("[A] confirmation order does not 'tamper' with prior rulings in the case; rather, to state the obvious, it confirms a plan of reorganization."); *cf. Transtexas*, 303 F.3d at 574, 582 (holding that bankruptcy court lacked jurisdiction to supplement plan confirmation order that was then pending on appeal); *Southold Dev. Corp.*, 129 B.R. at 18, 21 (vacating order that modified reorganization plan that was pending on appeal); *710 Long Ridge, II, LLC*, 2014 WL 1648725, at *1, *3-6 (refusing to consider motion to clarify plan confirmation order that was pending on appeal). Nor did the bankruptcy court issue any order that was inconsistent with, or that implicitly modified, its previous ruling.  *Cf. Whispering Pines*, 369 B.R. at 760 (concluding that bankruptcy court could not issue stay relief order that was inconsistent with confirmed plan while plan confirmation order was pending on appeal).  Instead, the bankruptcy court proceeded in accordance with that ruling.  It was entitled to do so—just as it was entitled to carry out the confirmed Plan in the absence of a stay order, even while the Plan confirmation order was pending on appeal.  *See In re Prudential Lines, Inc.*, 170 B.R. 222, 243-44

(S.D.N.Y. 1994). If the bankruptcy court had instead *denied* plan confirmation on the ground that Terry filed the involuntary petitions in *bad faith*, the divestiture analysis might be different. *Cf. BNP Petroleum*, 2012 WL 7620694, at *3 (observing that bankruptcy court can deny motion to set aside sale agreement, but cannot grant it while the order approving the sale agreement is pending on appeal). As it is, however, the bankruptcy court's Plan confirmation order did not in any way interfere with, or circumvent, this court's consideration of the First Appeal.

Moreover, to conclude that Neutra's appeal of the orders for relief divested the bankruptcy court of jurisdiction to confirm the Plan would be to hold that whenever an order for relief is entered, any disappointed litigant—even a litigant who *lacks standing to appeal*—can bring the bankruptcy case grinding to a halt. But the divestiture doctrine is not intended to "cede control of the conduct of a chapter 11 case to disappointed litigants. This cannot be, and is not, the law." *Sabine*, 548 B.R. at 680. And such a decision would be contrary to Fifth Circuit precedent indicating that "a narrow interpretation [of divestiture doctrine] is normally appropriate." *See Weingarten*, 661 F.3d at 908. The court thus concludes that the First Appeal did not divest the bankruptcy court of jurisdiction to confirm the Plan.

VII

The court now turns to the contention of HCLOF (joined by Highland and Neutra) in the Third Appeal that the bankruptcy court erred by confirming the Plan because the Temporary Injunction—a crucial part of the Plan—is unlawful.

- 53 -

## A

The bankruptcy court had authority to enter the Temporary Injunction under 11 U.S.C. §§ 105(a) and 1123(b)(6), and had jurisdiction to do so under 28 U.S.C. § 157(b)(2)(L). Section 157(b)(2)(L) grants the bankruptcy court jurisdiction to enter final orders concerning the confirmation of plans.[30]  Section 1123(b)(6) gives bankruptcy courts residual authority to include in a plan "any other appropriate provision not inconsistent with the applicable provisions of this title."  11 U.S.C. § 1126(b)(6).  The bankruptcy court can exercise its residual authority via § 105(a), which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

Section 105(a) permits a bankruptcy court "to fashion such orders as are necessary to further the substantive provisions of the Bankruptcy Code."  *In re Sadkin*, 36 F.3d 473, 478 (5th Cir. 1994) (per curiam) (quoting *In re Oxford Mgmt. Inc.*, 4 F.3d 1329, 1333 (5th Cir. 1993)).  But the bankruptcy court's § 105(a) powers are not unlimited: the statute "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable

---

[30]To the extent that a temporary plan injunction restrains a third-party *lawsuit*, the bankruptcy court must have statutory "related to" jurisdiction over that lawsuit per 28 U.S.C. § 157(a).  *See In re Seatco, Inc.*, 257 B.R. 469, 475-76 (Bankr. N.D. Tex.) (Houser, J.), *modified on reh'g by* 259 B.R. 279 (Bankr. N.D. Tex. 2001) (Houser, J.).  For the reasons discussed *infra* at note 34, the bankruptcy court has statutory "related to" jurisdiction over all lawsuits potentially restrained by the Temporary Injunction.  For the reasons discussed *infra* at § VII(B), the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011), does not affect the bankruptcy court's statutory jurisdiction to issue a temporary plan injunction.

under applicable law, or constitute a roving commission to do equity." *Id.* (quoting *Oxford Mgmt.*, 4 F.3d at 1333). The Trustee[31] contends that the bankruptcy court's § 105(a) powers are broad enough to allow it to temporarily enjoin a non-debtor, non-creditor entity—HCLOF—from attempting to assert certain contractual rights, at least where such an injunction is necessary to the debtors' successful reorganization.[32]

Fifth Circuit precedent indicates that § 105(a) *does*, under some circumstances, permit a bankruptcy court to enjoin a non-debtor, non-creditor entity from taking particular actions. *In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995), involved a challenge to a § 105(a) injunction that prohibited certain nonparties from filing lawsuits against certain other nonparties. *See id.* at 750-51. The Fifth Circuit—citing 11 U.S.C. § 524, which forbids the discharge of the debts of nondebtors—invalidated the injunction insofar as it constituted a *permanent* release of the nonparties' claims. *See id.* at 760-61. But the court noted that "[t]he impropriety of a permanent injunction does not necessarily extend to a temporary injunction of third-party actions." *Id.* at 761. The court provided a non-exhaustive list of "unusual circumstances" that might justify such an injunction: "1) when the nondebtor and the debtor enjoy such an identity of interests that the suit against the nondebtor is essentially a suit against the debtor, and 2) when the third-party action will have an adverse impact on the debtor's ability to

---

[31]On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third Appeal, arguing that once the Plan took effect, Acis became the Trustee's successor-in-interest. The court addresses this motion *infra* at § XI.

[32]The court expresses no opinion on the question whether the Equity PMA or any other contract presently entitles HCLOF to demand an optional redemption of the CLOs.

accomplish reorganization." *Id.* Bankruptcy judges in this district have approved temporary injunctions under *Zale* multiple times. *See In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109, 117 (Bankr. N.D. Tex. 2002) (Hale, J.); *In re Seatco, Inc.*, 257 B.R. 469, 476-78 (Bankr. N.D. Tex.) (Houser, J.), *modified on reh'g by* 259 B.R. 279 (Bankr. N.D. Tex. 2001) (Houser, J.); *see also In re Couture Hotel Corp.*, 536 B.R. 712, 749-53 (Bankr. N.D. Tex. 2015) (Houser, J.) (applying *Zale* unusual-circumstances test and declining to issue injunction). As discussed below, the second unusual circumstance described in *Zale* is present here.[33]

The court recognizes that the bankruptcy court did not rely on this rationale. Instead, it based the Temporary Injunction on its ostensible authority over the Trustee Adversary. The bankruptcy court described the Trustee Adversary as "a somewhat significant part of the Plan; it is what justifies the temporary injunction that is a critical part of the Plan." *Acis II*, 2019 WL 417149, at *8. It conducted its four-prong preliminary-injunction analysis in the context of, and based on the likelihood of success of, the Trustee Adversary. *See id.* at *10-12. This court, of course, can affirm the bankruptcy court on alternative grounds. *See, e.g., Cimmaron Oil Co. v. Cameron Consultants, Inc.*, 71 B.R. 1005, 1011 (N.D. Tex. 1987)

---

[33]The *Zale* panel ultimately vacated the temporary injunction because it was not issued after an adversary proceeding, as required at the time by Rule 7001(7). *See Zale*, 62 F.3d at 764-65. But Rule 7001(7) was amended in 1999 so that it does not apply where, as here, "a . . . chapter 11 . . . plan provides for the [injunctive] relief." Rule 7001(7); *see* Rule 7001 advisory committee's note (1999 amendments). And HCLOF, unlike the objectors in *Zale*, had a full and fair opportunity to present its objections to the bankruptcy court. *Cf. Zale*, 62 F.3d at 763-64.

(Fitzwater, J.) ("[T]his court may affirm a correct judgment for reasons not given by the court below or advanced to it.").  But here, the bankruptcy court's rationale is significant because "[i]f the bankruptcy court does not determine that unusual circumstances exist, the court may not enter an injunction of the third-party actions."  *Zale*, 62 F.3d at 761.

The bankruptcy court's factual findings are nonetheless sufficient to satisfy the "unusual circumstances" requirement.  The bankruptcy court expressly found that the Temporary Injunction is a "critical component of the Plan," *Acis II*, 2019 WL 417149, at *10, and that "[t]he Temporary Plan Injunction is essential to [Acis'] ability to perform the Plan," *In re Acis Capital Mgmt., L.P.*, 2019 WL 406137, at *14 (Bankr. N.D. Tex. Jan. 31, 2019) (Jernigan, J.).  HCLOF has twice demanded that Acis effect an optional redemption of the CLOs, and its directors testified that it will do so again if given the chance.  *See Acis II*, 2019 WL 417149, at *10.  The bankruptcy court found that an optional redemption would be an economically "[ir]rational" transaction that would serve as the last step in Highland's "intentional scheme to keep assets away from Mr. Terry as a creditor."  *Id.* at *12.  It further found that if HCLOF succeeds in forcing an optional redemption, Acis "[will] have no going concern value," and "Terry will be precluded from reorganizing the business and paying creditors" in accordance with the Plan.  *Id.* at *10.  Thus the Temporary Injunction enjoins third-party conduct that would adversely impact the ability of Acis to reorganize.  These are unusual circumstances that justify the bankruptcy court's Temporary Injunction.  *Cf. Zale*, 62 F.3d at 762 ("We hold that [the bankruptcy court's] language satisfies the 'unusual circumstances' requirement because it clearly identifies the settlement as providing

- 57 -

'substantial consideration' to the estate and constituting part of a 'key provision' of the plan.").[34]

B

HCLOF argues that the Trustee cannot invoke § 105(a) to support an injunction that is prohibited under *Stern v. Marshall*, 564 U.S. 462 (2011). In *Stern* the Supreme Court concluded that certain claims and controversies must, as a constitutional matter, be resolved by an Article III court, even if they are statutorily committed to the jurisdiction of the bankruptcy court. *See id.* at 482. HCLOF contends that the Trustee Adversary, which "is

---

[34]The Fifth Circuit's recent decision in *SEC v. Stanford International Bank, Ltd.*, 927 F.3d 830, ___, 2019 WL 2496901, at *5-7 (5th Cir. June 17, 2019), is not to the contrary. The *Stanford* panel interpreted *Zale*'s discussion of certain limits on a bankruptcy court's statutory "related to" jurisdiction to be a broad "maxim of law" that applies to all receiverships, regardless of the statutory basis of jurisdiction. *See id.* at ___, 2019 WL 2496901, at *6. *Zale* and *Stanford* thus stand for the proposition that a court overseeing a receivership lacks jurisdiction to enjoin third-party lawsuits whose resolution would have no effect on the *res* of the estate. *See id.* at ___, 2019 WL 2496901, at *7 (stating that courts lack jurisdiction "to permanently bar and extinguish independent, non-derivative third-party claims that do not affect the *res* of the receivership estate"); *Zale*, 62 F.3d at 752 ("Those cases in which courts have upheld 'related to' jurisdiction over third-party actions do so because the subject of the third-party dispute is property of the estate, or because the dispute over the asset would have an effect on the estate." (footnotes omitted)); *see also In re FoodServiceWarehouse.com, LLC*, 601 B.R. 396, ___, 2019 WL 1877006, at *10 (E.D. La. Apr. 26, 2019) ("If the outcome of a proceeding could conceivably have *any effect* on the estate being administered in bankruptcy, then 'related to' jurisdiction will generally exist." (citing *Zale*, 62 F.3d at 755)). The Temporary Injunction, however, enjoins certain acts that *would* affect the *res* of the bankruptcy estate. The bankruptcy court found that after an optional redemption, Acis "would have no going-concern value" because it would no longer receive any management fees with which to pay creditors. *Acis II*, 2019 WL 417149, at *10. Thus the equitable principles endorsed by *Stanford* do not prevent the bankruptcy court from issuing the Temporary Injunction pursuant to § 157(b)(2)(L)'s conferral of subject matter jurisdiction.

essentially a multi-faceted fraudulent transfer action," *Acis II*, 2019 WL 417149, at *8, involves such a claim. Thus, according to HCLOF, the bankruptcy court lacks authority to grant final relief in the Trustee Adversary, and where a court lacks the power to grant a litigant *final* relief, it cannot grant *preliminary* relief. *See* HCLOF Third Appeal Br. 22 (citing *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 561-62 (5th Cir. 1987)). HCLOF maintains that, because *Stern* prohibits the bankruptcy court from issuing the Temporary Injunction in the context of the Trustee Adversary, the bankruptcy court cannot issue the Temporary Injunction as part of the confirmed Plan.

Assuming *arguendo* that a fraudulent transfer claim brought by a bankruptcy trustee against a non-creditor is a *Stern* claim—i.e., "a claim designated for final adjudication in the bankruptcy court as a statutory matter, but prohibited from proceeding in that way as a constitutional matter," *Executive Benefits Insurance Agency v. Arkison*, 573 U.S. 25, 30-31 (2014)—the court disagrees with HCLOF's contention. Whatever the precise contours of *Stern*, it only concerns the power of a bankruptcy court to enter a "final judgment" on certain causes of action. *See Stern*, 564 U.S. at 503 ("The Bankruptcy Court below lacked the constitutional authority to enter a *final judgment* on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." (emphasis added)). When the bankruptcy court exercises powers that are *independent of* its authority to enter a final judgment on a claim—e.g., when it makes use of its authority under § 105(a) to issue a temporary plan injunction—*Stern* simply does not apply. *See, e.g., In re Yellowstone Mountain Club, LLC*, 646 Fed. Appx. 558, 558-59 (9th Cir. 2016) (per curiam) (holding that

- 59 -

*Stern* did not apply because "the bankruptcy court issued a preliminary injunction [pursuant to § 105(a)], not a final judgment"); *In re Quigley Co.*, 676 F.3d 45, 52 (2d Cir. 2012) ("[A]t issue here [is] the stay of litigation during the pendency of [debtor's] bankruptcy, rather than the entry of final judgment on a common law claim.").

This conclusion is consistent with the Article III concerns underlying *Stern*. According to *Stern*, Article III creates an independent judiciary by guaranteeing federal judges life tenure and an irreducible salary. *See Stern*, 564 U.S. at 483-84. But "Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III." *Id.* at 484. Thus, as a general rule, "Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty,'" and place that matter within the authority of an Article I bankruptcy court. *Id.* (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1856)).

The Temporary Injunction does not "withdraw from judicial cognizance any matter" of any kind whatsoever. *Id.* (quoting *Murray's Lessee*, 59 U.S. (18 How.) at 284). Instead, it *temporarily* enjoins a number of parties and non-parties from taking any action—including, presumably, pursuing a lawsuit—in furtherance of an optional redemption or liquidation of the Acis CLOs. To the extent that the Temporary Injunction affects any legal claims, it does not prevent an Article III court from entering a final judgment on those claims after the Temporary Injunction is lifted. In other words, it has no *res judicata* effect on those claims.

- 60 -

*Cf.* 43A C.J.S. *Injunctions* § 378 (2019) ("A temporary or preliminary injunction does not adjudicate the ultimate rights in controversy and it is not conclusive on the court on a subsequent hearing."). In this respect, the Temporary Injunction is similar to other mine-run, temporary bankruptcy injunctions—including the automatic stay, a hallmark of bankruptcy law that bars creditors from commencing or continuing any judicial action to recover a debt from the debtor after a bankruptcy petition is filed. *See* 11 U.S.C. § 362(a); *see also In re Quigley*, 676 F.3d at 52 ("Enjoining litigation to protect bankruptcy estates during the pendency of bankruptcy proceedings, unlike the entry of the final tort judgment at issue in *Stern*, has historically been the province of the bankruptcy courts."). Thus even if *Stern* prevents the bankruptcy court from entering a final judgment in the Trustee Adversary, it has no bearing on whether the bankruptcy court can issue the Temporary Injunction as part of the confirmed Plan.[35]

## C

When a bankruptcy court issues a temporary injunction under § 105(a) as part of a confirmed plan, the bankruptcy court must still consider the four-prong preliminary injunction test. *See, e.g., Seatco*, 257 B.R. at 477 (applying traditional preliminary-injunction factors in approving a temporary plan injunction under *Zale*). The factors are (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury

---

[35]The present appeal does not involve, and the court does not address, the propriety of a plan provision that finally adjudicates a *Stern* claim. Nor does the court decide whether a bankruptcy court can grant preliminary relief on a *Stern* claim outside the context of a plan confirmation order.

if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.  *See, e.g., Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

The first factor, when applied to a temporary plan injunction, turns on whether the reorganization plan is likely to succeed.  *See Seatco*, 257 B.R. at 477.  In support of the Temporary Injunction, the bankruptcy court evaluated the likelihood of success of the Trustee Adversary, not the likelihood of success of the Plan.  *See Acis II*, 2019 WL 417149, at *11-12.  But the bankruptcy court separately determined that the Plan is feasible, *see id.* at *14, and its factual findings in that context support the conclusion that the Plan is substantially likely to succeed.  The bankruptcy court found that Terry has an excellent track record as a portfolio manager; that Terry will be able to generate new business for Acis; and that Brigade is qualified to serve as the sub-advisor to Acis.  *See id.*  Thus in the absence of an optional redemption, it is substantially likely that the reorganized Acis will be able to satisfy its creditors' claims and emerge from bankruptcy.

The bankruptcy court did not clearly err in finding that, without the Temporary Injunction, Acis faces a substantial threat of irreparable injury: specifically, "evisceration of the Acis CLOs, by parties with unclean hands." *Id.* at *10.  The bankruptcy court found that an optional redemption would leave Acis with nothing to manage, and thus no going-concern value and no means of satisfying its creditors' claims.  *See id.*  Highland and Neutra argue that Acis has an adequate remedy at law because all it stands to lose is money—i.e., the

management fees generated by the PMAs—and it can recover that money via a final judgment in the Trustee Adversary. But there is more at stake here than money. Without the Temporary Injunction, Acis will have no opportunity to *reorganize* instead of *liquidate*—and, "[a]s the Code contemplates, the Debtor should be given the opportunity to successfully reorganize." *Seatco*, 257 B.R. at 477. To deny Acis the chance to reorganize would be to subject it to a substantial threat of irreparable injury.

The bankruptcy court likewise did not clearly err in finding that the risk of harm to Acis in the absence of an injunction outweighs any potential harm to HCLOF. Indeed, the bankruptcy court found that there *is* no potential harm to HCLOF because "a rational investor would not want to liquidate the Acis CLOs, but rather would acquire them to do a reset under the Plan." *Acis II*, 2019 WL 417149, at *12. The Plan allows for just such a reset.[36] Thus HCLOF's complaint that it is losing money on the CLOs as they are currently structured lacks force.

Finally, the bankruptcy court did not clearly err in finding that the public interest favors an injunction. The public has an interest in allowing businesses to reorganize instead of liquidate. And, more important, there is a strong public interest *against* "allowing potential wrongdoers to complete the last step in what appears likely to have been a scheme

---

[36]HCLOF contends that a reset is impossible under the terms of an offering memorandum that it issued in November 2017—i.e., within a month after Terry's arbitration award was issued—but the bankruptcy court did not find this contention to be credible, and this court will not disturb the bankruptcy court's credibility findings in the absence of clear error.

to strip [Acis] of its assets, steal its business, and leave it unable to pay creditors." *Id.* The bankruptcy court therefore did not err by concluding that the four-part preliminary injunction test supports the Temporary Injunction.

VIII

Highland and Neutra argue that the Trustee proposed the Plan in bad faith, contrary to 11 U.S.C. § 1129(a)(3).

A

The first contention that Highland and Neutra advance is that Terry filed the involuntary petitions in bad faith per 11 U.S.C. § 303(i)(2), and, as a result, any subsequently-proposed plan was necessarily proposed in bad faith. Highland and Neutra base their argument on *Natural Land Corp.*, 825 F.2d 296, in which the Eleventh Circuit held that "the taint of a petition filed in bad faith must naturally extend to any subsequent reorganization proposal." *Id.* at 298. It is not clear that this rule applies in the Fifth Circuit, and at least one bankruptcy court has declined to apply it. *See Landing Assocs.*, 157 B.R. at 812. But assuming *arguendo* that *Natural Land Corp.* does apply, Highland and Neutra have nonetheless failed to establish that Terry filed the involuntary petitions in bad faith.

1

The first question the court must resolve is what standard of review to apply. In their briefing in the First Appeal, Neutra and Terry agreed that the question whether Terry filed the involuntary petitions in good faith is a factual determination governed by the clear error standard. At oral argument, however, Neutra challenged whether this is the correct standard

of review.  But case law supports applying the clear error standard to the question of the petitioner's good faith.  *See, e.g., In re Macke Int'l Trade, Inc.*, 370 B.R. 236, 245 (B.A.P. 9th Cir. 2007) ("The bankruptcy court's finding of the absence of bad faith is reviewed under the clearly erroneous standard."); *In re Funnel Sci. Internet Mktg., LLC*, 551 B.R. 262, 269 (E.D. Tex. 2016) ("The Court reviews the Bankruptcy Court's determination of bad faith for clear error as a finding of fact."); *Forever Green Athletic Fields, Inc. v. Dawson*, 514 B.R. 768, 785 (E.D. Pa. 2014) ("'Proving an involuntary petition was filed in bad faith requires an inquiry into the creditor's knowledge,' a factual question that is reviewed for clear error." (quoting *In re Bock Transp., Inc.*, 327 B.R. 378, 381 (B.A.P. 8th Cir. 2005))), *aff'd sub nom. In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015).  Moreover, Fifth Circuit case law provides that, post-filing, "[a] bankruptcy court's determination that a debtor has acted in bad faith is a finding of fact reviewed for clear error."  *In re Jacobsen*, 609 F.3d 647, 652 (5th Cir. 2010).  The parties do not cite any cases suggesting that *de novo* review would apply; nor would it make sense to conduct a *de novo* review of what is, in large part, a question of the petitioner's intentions.  The court will therefore apply the clear error standard.[37]

---

[37]There is some case law suggesting that, where a bankruptcy court dismisses an involuntary petition on the ground that the petitioner filed it in bad faith, the *dismissal* is reviewed for abuse of discretion.  *See, e.g., Forever Green*, 804 F.3d at 335.  But even then, the bankruptcy court's finding that the petitioner acted in bad faith is reviewed for clear error. *See In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007); *see also Jacobsen*, 609 F.3d at 652 (observing that "[a] bankruptcy court's determination that a debtor has acted in bad faith is a finding of fact reviewed for clear error," even while "[t]he decision to convert a Chapter 13 case to Chapter 7" on that ground "is reviewed for abuse of discretion").

The court next considers what legal test governs a determination of bad faith.  This is not a clear-cut or easy question: courts have developed a "dizzying array of standards" that can be applied to the issue.  *Forever Green*, 804 F.3d at 335.  Some of these tests include:

> (1) the "improper use" test, which finds bad faith when a petitioning creditor uses involuntary bankruptcy proceedings in an attempt to obtain a disproportionate advantage for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interests in a different forum[;]

> (2) the "improper purpose" test, which finds bad faith based upon the petitioner's improper motivation for filing the petition. Cases under this line of reasoning have emphasized that the petition was motivated by ill will, malice or for the purpose of harassing the debtor[;]

> (3) the "objective test," which essentially asks the question whether or not a reasonable person would have filed the involuntary petition under the same circumstances;

> (4) the "subjective test" which is almost identical to the "improper purpose" test in that they both look to the subjective motivation of the petitioning creditor for the filing; and

> (5) the "combined" or "two part" test which finds bad faith based upon consideration of both the subjective motivation and the objective reasonableness of the petitioning creditor(s).[38]

---

[38]The "combined test" is often guided by principles from Rule 9011, which mirrors Fed. R. Civ. P. 11.  *See In re Landmark Distribs., Inc.*, 189 B.R. 290, 310 n.24 (Bankr. D.N.J. 1995).  The Second and Eleventh Circuits have likewise observed that "a number of courts have sought to model the bad faith inquiry on the standards set forth in Bankruptcy Rule 9011."  *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 106 (2d Cir. 2000) (citing *Gen. Trading, Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1501-02 (11th Cir. 1997)).

*In re Landmark Distribs., Inc.*, 189 B.R. 290, 309-10 (Bankr. D.N.J. 1995) (citations and footnotes omitted). Courts have also applied a "totality of circumstances" test, which essentially combines the improper use, improper purpose, and objective tests. *See, e.g., Forever Green*, 804 F.3d at 336 (citing *In re John Richards Homes Bldg. Co.*, 439 F.3d 248, 255 n.2 (6th Cir. 2006)). This test has been used by at least one bankruptcy court in this circuit. *See In re TRED Holdings, L.P.*, 2010 WL 3516171, at *7 (Bankr. E.D. Tex. Sept. 3, 2010).

The Fifth Circuit has not expressly endorsed any particular standard, but it has considered both objective and subjective factors in deciding whether an involuntary petition was filed in bad faith. *See In re Sims*, 994 F.2d 210, 222 (5th Cir. 1993) (considering whether "the filing of the petitions was 'motivated by ill will, malice or for the purpose of embarrassing or harassing the debtor[s],'" and whether petitioners "conducted a reasonable inquiry into the facts and the law prior to filing the petitions, as required by Bankruptcy Rule 9011" (alteration in original) (quoting *In re W. Side Cmty. Hosp., Inc.*, 112 B.R. 243, 258 (Bankr. N.D. Ill. 1990))). Any test that considers *only* subjective or objective factors thus cannot be correct. The court will therefore apply a totality of circumstances or combined test in analyzing Terry's good faith.

### 3

Applying the above principles, the court concludes that the bankruptcy court did not clearly err by holding that Terry filed the involuntary petitions in good faith.

On the question of Terry's alleged bad faith, the bankruptcy court found:

the evidence suggested that Mr. Terry and his counsel filed the Involuntary Petitions out of a legitimate concern that Highland was dismantling and denuding Acis LP of all of its assets and value and that a bankruptcy filing was the most effective and efficient way to preserve value for the Acis LP creditors.

*Acis I*, 584 B.R. at 144. This finding is not clearly erroneous. The record before the bankruptcy court showed that Acis and Highland had engaged in numerous transactions that stripped Acis of much of its value, and that Terry only filed the involuntary petitions after learning about these transactions during post-judgment discovery. *See supra* § I(C). Terry testified that he believed bankruptcy was the best way to stop Acis from making further fraudulent transfers, so that the entire community of Acis' creditors could receive an equitable distribution of assets. The bankruptcy court was entitled to credit this testimony. Terry also took the objectively reasonable step of consulting with bankruptcy counsel, albeit briefly, before making the filing. He reasonably believed that Acis had fewer than 12 creditors based on a net-worth affidavit he received during post-judgment discovery in the 44th Judicial District Court of Dallas County. As for whether Acis was paying its debts as they came due, Terry was aware of a number of accruing debts that Acis owed—including his own judgment against Acis. He also reasonably concluded that if Acis were stripped of its assets, then *no* creditor would be paid. The bankruptcy court did not clearly err by finding that Terry filed the petitions based on a legitimate, good-faith belief that Acis was fraudulently transferring assets to the detriment of all creditors.

Terry's motive, as characterized by the bankruptcy court, is a proper bankruptcy purpose. The Third Circuit, in a case relied upon by Neutra, describes "protect[ing] against

the preferential treatment of other creditors or the dissipation of the debtor's assets" as legitimate purposes of an involuntary petition. *Forever Green*, 804 F.3d at 335. An additional "purpose of an involuntary procedure is to provide a method for creditors to protect their rights against debtors who are not meeting their debts" by "forc[ing] [them] to submit to the jurisdiction of the bankruptcy court." *In re All Media Props., Inc.*, 5 B.R. 126, 137 (Bankr. S.D. Tex. 1980), *aff'd*, 646 F.2d 193 (5th Cir. Unit A May 1981) (adopting opinion of bankruptcy court). The bankruptcy court's characterization of Terry's "concern that Highland was dismantling and denuding Acis LP of all of its assets and value," to the detriment of all of Acis' creditors, fits comfortably into the bankruptcy purposes described above. *See Acis I*, 584 B.R. at 144.

Neutra argues that the timing of Terry's petitions reveals that he was not actually concerned about fraudulent asset transfers. Neutra points out that Terry filed the involuntary petitions mere hours before a scheduled temporary injunction hearing in Texas state court, and following a single meeting with bankruptcy counsel. According to Neutra, Terry's real motive was to collect his judgment in a more favorable forum. But Neutra's argument constitutes, at best, a plausible alternative view of the evidence. On appellate review, this court may not substitute its own interpretation of the evidence for that of the bankruptcy court in the absence of clear error. *See Johnson Sw.*, 205 B.R. at 827. Because the bankruptcy court did not commit clear error, its pertinent factual findings must be affirmed. *See id.*

Neutra cites a number of cases for the proposition that when an involuntary petition

is filed as a collection remedy in what is essentially a two-party dispute, the petition is necessarily filed in bad faith.  But Neutra's cases are distinguishable.

In *In re Smith*, 243 B.R. 169 (Bankr. N.D. Ga. 1999), the court found bad faith using a combined subjective and objective test where: (1) the petitioning creditor based its petition on the claim that the alleged debtor was fraudulently transferring assets, but had no evidence of any such transfers; (2) the case involved essentially a two-party dispute, and the petitioning creditor had sufficient remedies under state law; (3) the evidence showed that the petitioning creditor was motivated by a desire to shut down the debtor's business operations and to have the debtor criminally prosecuted; (4) the petitioning creditor failed to conduct critical research before filing its petition; and (5) the petitioning creditor failed to disclose the existence of additional creditors.  *See id.* at 195-201.  Here, by contrast, there *is* evidence that Highland was denuding Acis of assets; the bankruptcy court found that this is not a two-party dispute and that Terry's remedies under state law were insufficient; Terry conducted sufficient research before filing; and the bankruptcy court did not find that Terry was motivated by ill will or malice toward the debtor.

In *In re Frailey*, 144 B.R. 972 (Bankr. W.D. Pa. 1992), the court stated that "[a] bankruptcy court should refuse to enter an order for relief where petitioning creditors can go into state court to satisfy a debt."  *Id.* at 977-78.  But the cases cited by the *Frailey* court indicate that it did not make this statement in the context of a bad-faith filing analysis.  *See id.* (citing *In re Cent. Hobron Assocs.*, 41 B.R. 444, 451 (D. Haw. 1984) (applying balancing test to exclude unpaid debt from "not generally paying" determination); *In re Kass*, 114 B.R.

308, 309 (Bankr. S.D. Fla. 1990) (conducting abstention analysis under 11 U.S.C. § 305)). Indeed, the court in *Frailey* declined (on other grounds) to award the alleged debtor damages under § 303(i). *See id.* at 978. The case is therefore inapposite.[39]

*In re Tichy Elec. Co.*, 332 B.R. 364 (Bankr. N.D. Iowa 2005), states: "[t]he power of an involuntary petition must be exercised for the good of the entire creditor body and for legitimate bankruptcy purposes. It is not intended to be used in an exclusively self-serving manner as a collection device." *Id.* at 376. But in the present case, the bankruptcy court found that Terry acted out of concern for the entire body of Acis' creditors. And the petitioning creditors in *Tichy* did not actually intend to liquidate or reorganize the debtor. Rather, "[t]hey understood that after filing, some negotiations would occur, payments would be made, and the case dismissed." *Id.* In other words, the petitioning creditor intended to use the threat of bankruptcy as leverage to negotiate a settlement with the debtor. That does not appear to be the case here. Finally, unlike the present appeals, there is no indication in *Tichy* that the alleged debtor was fraudulently transferring assets in order to frustrate collection efforts. *See generally id.*

---

[39]Similarly, *In re Tarletz*, 27 B.R. 787 (Bankr. D. Colo. 1983), states that "it is obvious that the use of the bankruptcy court as a routine collection device would quickly paralyze this Court." *Id.* at 794. But this was in the context of 11 U.S.C. § 305 abstention, *not* a bad-faith filing analysis. *See id.* at 793. And *In re Spade*, 258 B.R. 221 (Bankr. D. Colo. 2001), holds that where a petitioning creditor seeks only to gain a litigation advantage over the debtor, and does not seek the orderly distribution of the debtor's assets to all creditors, § 305 abstention is appropriate. *See id.* at 233. Not only does *Spade* not involve a § 303(i) bad-faith analysis, it is also factually inapposite: the bankruptcy court here found that Terry *was* motivated by concern for all of Acis' creditors.

In sum, because the bankruptcy court did not commit clear error in determining that Terry filed the involuntary petitions in good faith, its relevant findings on this issue must be affirmed. Neutra and Highland's argument that the proposed Plan was tainted by Terry's bad-faith filing therefore fails to establish that the bankruptcy court committed reversible error.

B

Highland and Neutra maintain that the Plan fails to satisfy § 1129(a)(3) because it effects an unlawful result: allowing a portfolio manager to veto the wishes of the portfolio's owner. They cite *In re Noll*, 172 B.R. 122 (Bankr. M.D. Fla. 1994), for the premise that a reorganization plan cannot be proposed in order to obtain a result that would be unobtainable in state court. Highland and Neutra's reliance on *Noll* is misplaced. *Noll* is, by its own terms, of limited instructive value—it states that "one cannot define [bad faith] but will readily recognize it when one sees it." *Id.* at 124. The case is factually distinguishable because it involves a proposed plan that, in essence, would have constituted self-dealing by the plan proponent (who was not a disinterested trustee). *See id.* And it is difficult to square Highland and Neutra's characterization of the holding of *Noll*—that a reorganization plan cannot be used to obtain results that are unobtainable in state court—with Neutra's argument in the bad-faith filing context that filing involuntary petitions is *only* appropriate when the petitioner lacks adequate remedies in state court.

Highland and Neutra argue that the Plan is unlawful because it contains an overbroad release. They complain about language "vesting assets in the reorganized debtor 'free and

clear of all right, title, interests, claims, liens, encumbrances and charges'; purporting to

compromise all claims against the estates; preserving estates' right of setoff and recoupment;

and enjoining the 'continuation' of lawsuits against the debtors." Highland & Neutra Third

Appeal Br. 30. But this language merely effects the express terms of 11 U.S.C. §§ 524(a)

and 1141(c). *See* 11 U.S.C. § 524(a) ("A discharge in a case under this title . . . operates as

an injunction against the commencement or continuation of an action, the employment of

process, or an act, to collect, recover or offset any such debt as a personal liability of the

debtor[.]"); 11 U.S.C. § 1141(c) ("[A]fter confirmation of a plan, the property dealt with by

the plan is free and clear of all claims and interests of creditors, equity security holders, and

of general partners in the debtor."); *see also In re Coho Res., Inc.*, 345 F.3d 338, 343 (5th

Cir. 2003) ("11 U.S.C. § 524(a) operates as an injunction against actions against a debtor

subsequent to a discharge of a debt. The bankruptcy discharge and § 524 injunction serve

to give the debtor a financial fresh start." (internal quotation marks, emphasis, and footnote

omitted)). The challenged language does not render the Plan unlawful.[40] Highland and

Neutra have failed to demonstrate reversible error much less any error.

IX

The court now considers the argument of Highland and Neutra that the Plan fails to

meet the requirements of 11 U.S.C. § 1129(a)(5).

---

[40]Highland and Neutra also cite several cases for the proposition that a plan is
proposed in bad faith when it seeks merely to delay or frustrate the efforts of a secured
creditor. But Highland and Neutra are not secured creditors.

A

Section 1129(a)(5) provides that a plan may only be confirmed if:

> (A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and
>
> (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and
>
> (B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

*Id.* Neutra and Highland contend that the Plan is deficient because Terry is actually a non-statutory insider, and because Terry's ownership of Acis is not in the best interests of creditors, Acis' investors, or public policy.[41]

B

The court affirms the bankruptcy court's conclusion that Terry is not an insider.

---

[41]Neutra and Highland also contend that § 1129(a)(5)(A)(i) requires disclosure of the corporate structure of the reorganized debtor, and that the confirmed Plan is deficient because it merely states that Terry will have control over the structure of Acis instead of defining that structure in advance. In support of this argument, Neutra and Highland cite *In re GAC Storage El Monte, LLC*, 489 B.R. 747, 765-66 (Bankr. N.D. Ill. 2013). But the plan in *GAC Storage* did not fail because it left the management structure of the reorganized debtor undefined; rather, it failed because it did not disclose that the reorganized debtor's sole owner "intend[ed] to bring on either himself or another entity which he would control as the manager of [the debtor] and that the manager would have a 1% ownership interest in [the debtor]." *Id.* at 766. Thus *GAC Storage* is not controlling.

11 U.S.C. § 101(31) provides a list of persons who are considered to be "insiders" of the debtor based on their relationship with the debtor. A person not included in the statutory list can nonetheless qualify as a "non-statutory insider" under certain circumstances. In deciding whether a person is a non-statutory insider, the court considers two factors: "(1) the closeness of the relationship between the [putative insider] and the debtor; and (2) whether the transactions between the [putative insider] and the debtor were conducted at arm's length." *In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992); *accord In re A. Tarricone, Inc.*, 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002). Highland and Neutra contend that a person can be a non-statutory insider based on his relationship with a statutory insider of the debtor, regardless of his relationship with the debtor itself. *See A. Tarricone*, 286 B.R. at 263-64. They then assert that the Trustee, as a person in control of the debtor, is a statutory insider. *See In re GSC, Inc.*, 453 B.R. 132, 158 n.31 (Bankr. S.D.N.Y. 2011). The court will assume *arguendo* that these legal assertions are correct. Highland, Neutra, and the Trustee agree that the bankruptcy court's determination of insider status is a question of fact that is reviewed for clear error. *See U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, ___ U.S. ___, 138 S. Ct. 960, 966 (2018).

Highland and Neutra posit that the relationship between the Trustee and Terry is unusually close. The controlling question under the first factor is whether the relationship is close enough for the alleged insider to gain advantage due to affinity. *See In re Rexford Props., LLC*, 557 B.R. 788, 797 (Bankr. C.D. Cal. 2016). Among the indicators of closeness cited by Highland and Neutra are: that the lawyers who represented Terry in the filing of the

involuntary petitions now represent the Trustee; that the Trustee relied on Terry's financial advice for a period of time after the Trustee's appointment; that Terry's expert witness in the arbitration was engaged by the Trustee to testify at the confirmation hearings; that Terry's counsel in related litigation in Guernsey testified as an expert at the confirmation hearings; and that Terry introduced Oaktree to the Trustee's predecessor. As for whether the Plan was negotiated at arm's length, Highland and Neutra point out that the Trustee did not solicit competing bids for Acis' equity, and that there was essentially no negotiation between the Trustee and Terry regarding that price.

But after reviewing the record, the court is not "left with the definite and firm conviction that a mistake has been committed." *Johnson Sw.*, 205 B.R. at 827 (quoting *Placid Oil*, 158 B.R. at 412). The Trustee testified that, before the bankruptcy cases, he had no relationship with Terry—and after he was appointed, his relationship with Terry was typical of that between a trustee and the debtor's largest creditor. He relied on Terry's financial advice for a brief time out of necessity, not affinity. Terry appears to have been represented by independent counsel in his dealings with the Trustee. The lack of an auction can be explained by the Trustee's assertion—credited by the bankruptcy court—that no other creditor was a logical choice to be Acis' equity owner. And the record indicates that there was at least some negotiation between Terry and the Trustee regarding the amount of the reduction of Terry's claim against the estates. Indeed, according to the Trustee's testimony, Terry thought the price for Neutra's equity was *too high*, but the Trustee held firm and Terry gave in. These facts plausibly support the findings that Terry and the Trustee were not so

close as to give Terry an advantage based on affinity, and that the Plan was negotiated at arm's length. The bankruptcy court thus did not commit clear error by finding that Terry was not an insider.[42]

C

Highland and Neutra's remaining § 1129(a)(5) arguments—that Terry's appointment as Acis' new equity owner is contrary to the interests of creditors, investors, and the public—are unavailing.

Highland and Neutra first contend that "[c]onfirmation of a Chapter 11 plan of reorganization that was designed to allow an *insider* to obtain ownership of the reorganized debtor for an improper purpose is against public policy." Highland & Neutra Third Appeal Br. 43 (emphasis added) (citing *In re S. Beach Sec., Inc.*, 606 F.3d 366, 371 (7th Cir. 2010)). But Terry is not an insider, and—as discussed *supra* at § VIII(A)(3)—he pursued Acis' involuntary bankruptcy in good faith and for a proper bankruptcy purpose.

Highland and Neutra also assert that "a bankruptcy court must, by considering the broader public policy interests, prevent the appointment of a proposed leader who has a conflict of interest or other financial or personal affiliation that would make his or her control inappropriate." Highland & Neutra Third Appeal Br. 44. They note that Terry is embroiled in a battle with HCLOF over control of the subordinated notes, and with Highland itself over

---

[42]As an additional ground for finding that Terry is an insider, Highland and Neutra assert that Terry had access to voluminous insider information during the pendency of these cases. But they cite no evidence in the record on appeal in support of this assertion.

myriad issues in state court.  But this assertion is not entirely accurate: it is *Acis*, not Terry, who is battling with HCLOF over the subordinated notes.   And even if Terry has disagreements with Highland in state court, this fact is not necessarily dispositive of whether the Plan is in the public interest.  According to case law cited by Highland and Neutra, there are numerous factors to consider in deciding whether a proposed plan is in the public interest, and the weight given to each factor varies depending on the circumstances of the case.  *See In re Digerati Techs., Inc.*, 2014 WL 2203895, at *5 (Bankr. S.D. Tex. May 27, 2014). Relevant factors include whether the appointment "perpetuate[s] incompetence, lack of direction, [or] inexperience," and whether "the individual [is] capable and competent to serve in the proposed capacity assigned to him."  *Id.*  The bankruptcy court found that Terry is "well qualified to reorganize" Acis and that his new role "will be similar to the role he very successfully performed for" Acis.  *Acis II*, 2019 WL 417149, at *14.  Giving appropriate weight to all of the public policy factors in the context of this case—particularly in light of the bankruptcy court's finding that Highland has "unclean hands," *id.* at *10—the court concludes that the bankruptcy court did not clearly err by finding that confirmation of the Plan was consistent with public policy.

X

Finally, the court considers the contention of Highland and Neutra that the Plan does not satisfy the cram-down requirements of 11 U.S.C. § 1129(b).

It is familiar jurisprudence that the acceptance of all impaired classes of claims or interests required by § 1129(a)(8) is not necessary for plan confirmation when § 1129(b) is

satisfied. Section 1129(b) permits confirmation when all other requirements of § 1129(a) are met and "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." § 1129(b)(1). The court reviews the bankruptcy court's finding that the cram-down requirements are met for clear error. *See In re Block Shim Dev. Co.-Irving*, 118 B.R. 450, 452 (N.D. Tex. 1990) (Fitzwater, J.).

Highland and Neutra challenge the bankruptcy court's finding that the Plan meets these requirements, contending the Plan is neither fair nor equitable to them, in violation of § 1129(b)(1).[43] More specifically, Highland and Neutra assert that the Plan violates the absolute priority rule and its corollaries.

Under the absolute priority rule, "fairness and equity require[] that 'the creditors . . . be paid before the stockholders [can] retain [equity interests] for any purpose whatever.'" *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle Street P'ship*, 526 U.S. 434, 444 (1999) (last alteration in original) (quoting *N. Pac. R.R. Co. v. Boyd*, 228 U.S. 482, 508 (1913)). The reason for the rule is "the danger inherent in any reorganization plan proposed by a debtor . . . that the plan will simply turn out to be too good a deal for the debtor's owners." *Id.* The rule is embodied in § 1129(b)(2)(B)(ii). *See LaSalle*, 526 U.S. at 449. The debtor's old equity owners *can* retain their interest in the debtor if they contribute new value to the bankruptcy estate, and this new value "makes the senior creditors (and the estate as a whole)

_____

[43]Highland and Neutra also argue that the requirements of § 1129(a)(3) are not met. For the reasons discussed *supra* at § VIII, the court rejects this argument.

better off." *In re Castleton Plaza, LP*, 707 F.3d 821, 821 (7th Cir. 2013). The way to assess whether the value contributed by the old equity owners makes the senior creditors better off is to allow for a market valuation of the debtor's equity. *See LaSalle*, 526 U.S. at 454-58.

Highland and Neutra contend that the Plan violates the absolute priority rule because there was no market test to assess the value of Acis' equity—instead, the Trustee unilaterally selected the $1 million number without soliciting competing bids. But the absolute priority rule, by its own terms, only applies when the debtor's old equity owners will retain their equity interest after bankruptcy. *See LaSalle*, 526 U.S. at 444. Where, as here, a non-insider creditor becomes the debtor's new owner, there is no "danger . . . that the plan will simply turn out to be too good a deal for the debtor's [old] owners." *Id.* Whatever the significance of the Trustee's failure to solicit competing bids, it does not violate the absolute priority rule in this instance.

Highland and Neutra also argue that the Plan violates a corollary of the absolute priority rule: "that a senior class cannot receive more than full compensation for its claims." *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) (quoting *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D. Del. 2001)). They assert that "to obtain confirmation of a reorganization plan that completely extinguishes equity interests, the plan's proponent must prove that there is no value left once the creditors have had their turn." Highland & Neutra Third Appeal Br. 47 (quoting *In re Dave's Detailing, Inc.*, 2015 WL 4601726, at *16 (Bankr. S.D. Ind. July 30, 2015)). This, in turn, requires a showing that no creditor is paid more than in full. *See In re MCorp Fin., Inc.*, 137 B.R. 219, 235 (Bankr. S.D.

Tex. 1992), *abrogated on other grounds by In re Briscoe Ents., Ltd., II*, 994 F.2d 1160, 1164 n.11 (5th Cir. 1993). Highland and Neutra maintain that the Plan violates this rule in two ways.

First, they contend that the bankruptcy court wrongly inflated the value of the secured portion of Terry's partially-secured claim from approximately $634,000 to $1 million. This argument rests on an erroneous understanding of the Plan. The Plan reduces the *total* value of Terry's partially-secured claim—i.e., the sum of both the secured and unsecured portions of his claim—by $1 million, and then treats the remaining *total* balance of Terry's claim as a general unsecured claim. The Plan does not inflate the value of his secured claim.

Second, Highland and Neutra argue that, without a market test of Acis' value, the bankruptcy court could not have determined whether Terry was overcompensated when he received Acis' equity in exchange for a $1 million reduction in his claim. But there *was* a market valuation in the present case. In *LaSalle* the Supreme Court suggested (but did not decide) that the termination of exclusivity—i.e., allowing any interested person to submit a competing reorganization plan—can constitute a sufficient market test of a debtor's value. *See LaSalle*, 526 U.S. at 458. Since then, courts have concluded in a number of cases that opening the bankruptcy process to competing plan proposals is a valid market test. *See H.G. Roebuck & Son, Inc. v. Alter Commc'ns, Inc.*, 2011 WL 2261483, at *7 (D. Md. June 3, 2011) ("Indeed, if the Bankruptcy Court simply allowed Roebuck to file a competing plan, and the creditors found that plan to be inferior, they could still vote for Alter's original plan, and [*LaSalle*] would have been satisfied."); *Dave's Detailing*, 2015 WL 4601726, at *18

("The termination of exclusivity provides an open market for competition in the form of competing plans."); *In re Situation Mgmt. Sys., Inc.*, 252 B.R. 859, 866 (Bankr. D. Mass. 2000) ("[T]he competing plan approach provides for a more informed process for creditors and to interested bidders than an auction of equity interests in the context of a Debtor's plan."); *In re Homestead Partners, Ltd.*, 197 B.R. 706, 716-17 (Bankr. N.D. Ga. 1996) ("Competing plans certainly would foster alternate bids for control of the reorganized debtor, and would thereby dispel any concerns regarding the necessity and value of the shareholder's offer."); *In re SM 104 Ltd.*, 160 B.R. 202, 227 (Bankr. S.D. Fla. 1993) ("[A]t least in all but the largest bankruptcy cases, the disclosure and confirmation procedures provided by Chapter 11 offer an acceptable alternative for marketing the ownership interests of the reorganized debtor.").[44]

No party in the present case held the exclusive right to propose a reorganization plan. Highland and Neutra could have proposed a competing plan if they believed that the Trustee's plan undervalued Acis' equity. They did not do so. Thus the bankruptcy court did not err by approving a Plan that valued Acis' equity at $1 million.

---

[44]Highland and Neutra's argument to the contrary, based on the Seventh Circuit's opinion in *Castleton*, 707 F.3d 821, is unpersuasive. The court in *Castleton* concluded that the termination of exclusivity was insufficient to constitute a market test in the context of the absolute priority rule. *See id.* at 823-24. The court applied that rule because the person receiving the debtor's equity under the plan was an insider. *See id.* In contrast, Terry is not an insider, and the absolute priority rule does not apply in the present case. *See Dave's Detailing*, 2015 WL 4601726, at *18 ("The holding in *Castleton Plaza* applies to shareholders or insiders—not to non-insider third parties—obtaining equity in a reorganized debtor.").

XI

On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third Appeal. It maintains that, once the Plan took effect, Acis became the Trustee's successor-in-interest. But as Acis recognizes, "the Federal Rules of Bankruptcy Procedure applicable to this case, those numbered 8001-8028, do not provide a specific rule governing substitution of parties in bankruptcy appeals to the district court." Acis Mot. Substitute 3. Acis also fails to cite, and the court has not found, any case in which a district court allowed such party substitution while an appeal was pending. Accordingly, the court in its discretion denies Acis' motion. *Cf. Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 743 (7th Cir. 1985) (holding that substitution of parties under an analogous rule, Fed. R. Civ. P. 25(c), is within court's discretion). If Acis wishes to take the place of the Trustee in any further appeal to the Fifth Circuit, it may make a request under the procedure prescribed by Fed. R. App. P. 43.

\*   \*   \*

In the First Appeal, the clerk is directed to strike ECF Doc. No. 2 from the docket of No. 3:18-CV-1084-D and to refile that document in No. 3:18-CV-1057-D with a filing date of April 27, 2018.

The court DISMISSES the appeals of the orders denying intervention in Nos. 3:18-CV-1056-D and 3:18-CV-1084-D, and DISMISSES the appeals of the orders for relief in Nos. 3:18-CV-1057-D and 3:18-CV-1073-D.

The court AFFIRMS the Break-Up Fee and Expense Reimbursement order at issue

in the Second Appeal, No. 3:18-CV-1822-D.

In the Third Appeal, No. 3:19-CV-0291-D, the court AFFIRMS the bankruptcy court's order confirming the Plan and approving the disclosure statement.

The court DENIES Acis' April 12, 2019 motion to substitute party.

AFFIRMED in part; DISMISSED in part.

July 18, 2019.


_____
SIDNEY A. FITZWATER
SENIOR JUDGE